# IN THE SUPREME COURT OF IOWA

No. 08–1524

Filed June 24, 2011

**STATE OF IOWA,**

    Appellee,

vs.

**RANDY SCOTT MEYERS,**

    Appellant.

---

On review from the Iowa Court of Appeals

Appeal from the Iowa District Court for Scott County, Gary D. McKenrick, Judge.

Defendant seeks further review of court of appeals' decision affirming his conviction for sexual abuse and lascivious acts with a minor. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and David A. Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Michael J. Walton, County Attorney, and Julie A. Walton, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

Randy Scott Meyers seeks further review of a decision by the court of appeals that affirmed his conviction for sexual abuse in the third degree and lascivious conduct with a minor. Meyers primarily challenges the sufficiency of the evidence to support the convictions. On our review, we affirm the decision of the court of appeals and affirm the judgment and sentence of the district court.

**I. Background Facts and Prior Proceedings.**

In the fall of 1993, Randy Scott Meyers met and began dating Patricia, a single mother of two children. Meyers was thirty years old. Patricia and her children lived in Davenport. The oldest child, Mindy, was six years old at the time. Meyers moved in with Patricia and her two children in the spring of 1994. The couple had one child together later that year.

In June 1995, Meyers was convicted of the crime of lascivious acts with a child after Patricia found Meyers engaging in sexual activity with Mindy in her bedroom. He was sentenced to five years in prison. Shortly after he completed serving his sentence, Meyers returned to live with Patricia and her children. He then married Patricia, and the couple continued to live together in Davenport with the children.

Patricia suffered from bipolar disorder during the course of their marriage. She threatened and attempted suicide while the children were present and was hospitalized. Meyers was the "controlling figure" to the children. At times, Meyers physically and mentally abused Mindy, as well as her younger brother. In September 2004, the Department of Human Services (DHS) investigated an injury inflicted on Mindy by Meyers.

After the incident of physical abuse, the already contentious familial circumstances deteriorated rapidly. Meyers, Patricia, and Mindy had started to smoke crack cocaine together. Meyers supplied the cocaine. Mindy

quickly developed an addiction to the drug, which caused her to drop out of high school. She was seventeen years old. In late 2004, Patricia sought and received a protective order against Meyers that required him to move out of their Davenport home. Disharmony also developed between Mindy and Patricia, which caused Mindy to leave the home. She began living with Meyers in his trailer outside Davenport.

On New Year's Eve 2004, Meyers and Mindy had a party at the trailer. Mindy consumed alcohol at the party. On at least two occasions, guests observed Mindy and Meyers go into Meyers' bedroom or the bathroom together for thirty minutes or more. On a separate occasion, Meyers was observed touching Mindy's face and hair in a romantic way while telling her she was beautiful.

Mindy lived with Meyers until January 2005, when Patricia sought and obtained a court order for her involuntary commitment for drug treatment. Mindy was initially admitted to a hospital in Davenport for treatment. In the spring of 2005, she was transferred to Youth Shelter Services, a residential treatment facility in Ames.

After Mindy was placed at Youth Shelter Services, Meyers moved to Ames to be closer to her. He was subsequently convicted of lascivious conduct with a minor and was sentenced to one year in jail. Mindy was the victim of the crime. While in jail, Meyers sent Mindy a series of letters. Many of the letters professed love for Mindy and revealed she was the object of his sexual and romantic desires. In one letter dated March 8, 2006, Meyers wrote:

> All I want is to buy you things (hold you) and make little ones with you. Please be mine. . . . It's been over 60 days since I've had sex. It has been with this one beautiful blonde.[1] . . . She is so gorgouse [sic] so careing [sic] and everything I've ever wanted.

---

[1]Evidence at trial showed the phrase "beautiful blonde" referred to Mindy.

I love this beautiful blond! (Her p---- taste great) The best I've ever tasted. The best in bed also and she treats me like a king . . . .

In another letter to Mindy dated March 12, 2006, Meyers wrote: "I must have you soon. I must hold you soon . . . . Remember our shower. I love memories . . . . I'd give anything to have you again and again and again. You no [sic] what I mean." Meyers also described Mindy's physical attributes in a letter dated March 11, in which he stated:

Your legs are awesome your hips are perfect your chest is more woman than I can handle your lips are thin and hot your face is perfect your toes are cool but I'll admit I haven't looked at them as much as your beautiful body but I will!

These letters were signed "Love, Randy." In other letters, Meyers signed "Love, Dad." In one such letter, Meyers advised Mindy to sell his truck and keep the money to live on and to "be a good kid." Mindy gave the letters to her Alcoholics Anonymous sponsor and friend, Johnna Folkmann-Ask. Folkmann-Ask confronted Meyers about the letters over the phone and told Meyers to stop calling Mindy.

The DHS child protection worker, who had been initially involved with the family in 2004, Kim Cronkleton Fish, continued working with the family's case in 2005. In June 2005, Fish visited Mindy at the Ames shelter to follow up on a report of sexual abuse between Meyers and Mindy. Fish also interviewed Meyers, who admitted he and Mindy had "crossed the line" and that he knew it was wrong. Meyers further admitted to Fish that the sexual activity with Mindy he described in the letters had actually taken place.

The State charged Meyers with two counts of sexual abuse in the third degree, one count of lascivious conduct with a minor, and one count of distributing a controlled substance to a minor for his conduct with Mindy while they resided together in Meyers' trailer between September 2004 and

January 2005. The State offered two alternative theories of sexual abuse under Iowa Code section 709.4 (2003). The first alternative alleged Meyers performed sex acts by force or against Mindy's will. *See* Iowa Code § 709.4(1). The second alternative alleged Meyers performed sex acts at a time when Mindy was suffering from a mental defect or incapacity. *See id.* § 709.4(2)(*a*). Meyers waived his right to a jury trial and proceeded to a bench trial. Mindy did not testify at trial, and the trial court denied the State's offer to admit her deposition into evidence in her absence.

At trial, the State introduced evidence consistent with the background facts set forth in this opinion. Additionally, the State offered the testimony of an expert witness, Dr. Richard Hutchison, a board-certified clinical psychologist who specializes in the mental health treatment of children and families. Dr. Hutchison opined that Mindy did not have the ability to consent to a sex act with Meyers under all the circumstances of the case. The State asked Dr. Hutchison a series of hypothetical questions about the psychological state of a girl in Mindy's circumstances from the time she was sexually abused as a young child by her stepfather to when she moved in with her stepfather and began a romantic relationship with him involving sex.[2] Dr. Hutchison generally opined that a girl in Mindy's situation would not be psychologically able to effectively consent to sex with her stepfather. He testified that Meyer's past abuse of Mindy in their home as her father figure, along with Patricia's support of Meyers following the abuse, would confuse a child's boundaries and freeze the child's emotions at the age of the trauma if left untreated. Dr. Hutchison also testified a child witnessing and

---

[2]Iowa prohibits a sexual relationship between stepparent and stepchild when the parents are still married. *See* Iowa Code § 726.2; *see also Back v. Back*, 148 Iowa 223, 231, 125 N.W. 1009, 1012 (1910). An incestuous relationship, however, is not the same as sex without consent. *State v. Jones*, 233 Iowa 843, 845, 10 N.W.2d 526, 527 (1943). The State did not charge Meyers under section 726.2.

experiencing physical violence in the home by Meyers would fear resisting him. He further testified that a chaotic household without appropriate decision making and boundaries would cause increased confusion. Additionally, Dr. Hutchison testified an addiction to crack cocaine, with the authority figure as the supplier, would cause a physiological layer of dependency. The State concluded its questioning of Dr. Hutchison by asking him to express his expert opinion about Mindy's ability to consent to sexual activity with Meyers based on the evidence presented at trial. Dr. Hutchison concluded the combination of all the factors in Mindy's life would cause her to have a "below normal" ability to resist her stepfather and that, ultimately, Mindy would not have the ability to consent to sex with him.

The district court found Meyers guilty of all charges against him. The court concluded there was insufficient evidence Mindy was "mentally incapacitated" under Iowa Code section 709.4(2)(*a*) at the time of the sex acts with Meyers. Yet, it found Meyers guilty of sexual abuse in the third degree under the totality of the circumstances that showed the sex acts were against Mindy's will because they occurred while she was psychologically unable to consent to Meyers' advances as her stepparent. *See* Iowa Code § 709.4(1). Relying on the same facts, the court found Meyers guilty of lascivious conduct with a minor based on evidence that Meyers had "persuaded [Mindy] to disrobe for the purpose of arousing his sexual desires." *See id.* § 709.14. Finally, the court found the State proved Meyers was guilty of distributing a controlled substance to a minor under Iowa Code section 124.406.

Meyers appealed from his conviction for lascivious conduct with a minor and sex abuse in the third degree.[3] He primarily challenged the

---

[3]Meyers does not appeal from his conviction for distribution of a controlled substance to a minor under Iowa Code section 124.406.

sufficiency of the evidence to support the conviction. The thrust of the challenge targets the absence of testimony from Mindy that the sex acts with him were by force or against her will. Meyers asserts Mindy's consent cannot be negated without expert evidence that she suffered from a recognized mental defect. He claims the expert testimony presented by the State that she was psychologically unable to consent is insufficient to vitiate consent under the statute. We transferred the case to the court of appeals. A divided court affirmed the judgment and sentence of the district court. We granted Meyers' request for further review.

## II.  Scope of Review.

We review challenges to the sufficiency of evidence presented at trial for correction of errors at law. *State v. Hennings*, 791 N.W.2d 828, 832 (Iowa 2010). In doing so, we examine whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record. *Id.* at 832–33. We find evidence substantial if it would convince a rational fact finder the defendant is guilty beyond a reasonable doubt. *State v. McCullah*, 787 N.W.2d 90, 93 (Iowa 2010). We draw all fair and reasonable inferences that may be deduced from the evidence in the record. *Hennings*, 791 N.W.2d at 832–33. In assessing the sufficiency of the evidence, we find circumstantial evidence equally as probative as direct. *State v. Liggins*, 524 N.W.2d 181, 186 (Iowa 1994).

## III.  Evidence of Sexual Abuse.

The State alleges two separate occasions of sexual abuse between September 2004 and January 2005. To sustain the conviction, there must be sufficient evidence of every fact necessary to support each count. *See State v. Capper*, 539 N.W.2d 361, 364 (Iowa 1995) ("In determining the sufficiency of the evidence we consider each count separately."), *rev'd on other grounds by State v. Hawk*, 616 N.W.2d 527, 530 (Iowa 2000). The first

requirement for sexual abuse in the third degree is the State must provide sufficient evidence a sex act occurred. *See* Iowa Code § 709.4. To prove a sex act occurred, the State presented Meyers' statements admitting to numerous sex acts with Mindy, along with circumstantial evidence of the existence of a sexual relationship. Meyers claims there was insufficient corroborative evidence to support his references to sex acts with Mindy.

**A. Sufficient Evidence of Sex Act.** Our law on the admissibility of confessions has been substantively unchanged since its inception in 1860. *See* Iowa Code § 4806 (1860). Under this law, extrajudicial confessions of a defendant cannot result in a conviction in the absence of corroborating evidence of the crime charged. Iowa R. Crim. P. 2.21(4). The general policy behind the statute is to help ensure convictions will not be based upon untrue or coerced confessions. *Comments on Recent Cases*, 36 Iowa L. Rev. 694, 704 (1951); *see also Warszower v. United States*, 312 U.S. 342, 347, 61 S. Ct. 603, 606, 85 L. Ed. 876, 880 (1941) ("The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone.").

Although there is no confession by Meyers in this case to any of the charges, there were numerous admissions. Admissions can constitute a confession when they "amount to an acknowledgement of the guilt of the offense charged." *Capper*, 539 N.W.2d at 364. As a result, admissions are treated with the same evidentiary precautions as confessions. *See State v. Polly*, 657 N.W.2d 462, 466 n.1 (Iowa 2003). Thus, admissions of essential facts or elements of the crime made after the alleged crime must be supported with sufficient corroborating evidence. *Id.*

Corroborating evidence is sufficient to support a conviction based on a confession when it tends to "confirm[] some material fact connecting the defendant with the crime." *State v. Robertson,* 351 N.W.2d 790, 793 (Iowa

1984). It is sufficient as long as it supports the content of the confession and if, together with the confession, proves the elements of the charge against the defendant beyond a reasonable doubt. *State v. Wescott*, 130 Iowa 1, 8, 104 N.W. 341, 344 (1905). Corroborating evidence may be either direct or circumstantial. *See Liggins*, 524 N.W.2d at 187. It need not be strong evidence, "nor need it go to the whole of the case so long as it confirms some material fact connecting the defendant with the crime." *Id.* Circumstantial corroborating evidence may include several facts that, when combined, support the admission. *Id.*

Meyers admitted to instances of oral sex and sexual intercourse with Mindy in letters he wrote in jail in the spring of 2005. Meyers specifically recounted at least two instances of oral sex and sexual intercourse with Mindy in these letters. At trial, the State also presented evidence that Meyers indicated the relationship and activity described in his letters to Mindy were "her choice." Finally, the child protective worker testified that Meyers told her he and Mindy had "crossed the line," and that he "knew it was wrong, but it happened."

The State also offered additional facts that corroborated these admissions. Aside from the testimony of the child protective worker and the AA sponsor, the State introduced the testimony of Mindy's friend, who said Mindy disappeared with Meyers several times during a New Year's Eve party into Meyers' bedroom and that Meyers generally behaved romantically towards Mindy. The State also introduced evidence of the prior sexual abuse of Mindy by Meyers in 1994 and 2005. Finally, Mindy's AA sponsor testified that Meyers and Mindy would sing a sexually explicit song to one another during their telephone conversations. Taken individually, these circumstances would not be legally conclusive as to the existence of any sexual encounters between Mindy and Meyers. However, we find,

cumulatively, these circumstances "confirm[] some material fact connecting the defendant with the crime." *Robertson*, 351 N.W.2d at 793. As a result, we conclude the district court did not err in finding sufficient evidence that two sex acts occurred.

**B. Sufficient Evidence Sex Acts Were "By Force or Against the Will of" Mindy.** Meyers next claims there was insufficient evidence the sex acts were done "against the will of" Mindy to support a conviction for sexual abuse in the third degree. *See* Iowa Code § 709.4(1). He claims the evidence of Mindy's history with him is insufficient to establish her lack of consent, even when aided by expert opinion. Consistent with the decision of the district court, the State asserts the statutory element of "by force or against the will" includes circumstances in which pervasive psychological coercion vitiates the consent of the victim.

Structurally, Meyers argues his conduct in this case did not fall within any specific statutory category of section 709.4 that addresses the inability of the other person to consent, and there was no evidence presented at trial of either physical force exhibited by him or nonconsent voiced or exhibited by Mindy to support a conviction under the "by force or against the will" standard of section 709.4(1). In particular, Meyers argues the State's evidence attempted to show Mindy suffered from a mental defect, and the mental-defect standard of section 709.4(2)(*a*) does not include the inability of an otherwise mentally competent individual to consent to sex with just one particular person.

At the outset, it is unnecessary for us to address Meyers' argument that the "mental defect" standard under section 709.4(2)(*a*) is inapplicable to the circumstances presented in this case. Meyers was charged and prosecuted under two categories of sexual abuse. The State alleged Meyers engaged in sex acts with Mindy either "by force or against" her will under

section 709.4(1) or while she was suffering from "a mental defect or incapacity" that precluded consent under section 709.4(2)(*a*). The district court found insufficient evidence of a mental incapacity, but concluded there was sufficient evidence of psychological manipulation by Meyers to establish Mindy did not give effective consent under section 709.4(1). The district court found the sex acts were against Mindy's will based on evidence presented by the State's expert witness. Thus, our task is to decide if the "by force or against the will" standard of section 709.4(1) includes consent negated by psychological factors and, if so, whether there was sufficient evidence presented in this case to support a conviction. *See* 3 Charles E. Torcia, *Wharton's Criminal Law* § 287, at 30–31 (14th ed. 1980) [hereinafter Torcia] (noting the terms "against the female's will" and "without her consent" are synonymous).

We begin our resolution of the sufficiency-of-the-evidence issue by first examining the applicable statutory language. We recognize it is the responsibility of our legislature to define crimes. *State v. Welton*, 300 N.W.2d 157, 160 (Iowa 1981). Our task is to apply and interpret such statutes to carry out the legislative intent based on the facts and circumstances of each case. *See Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). When a statute is ambiguous, we employ our familiar rules of statutory interpretation to aid us in ascertaining the intent of the legislature. *McCullah*, 787 N.W.2d at 94. A statute is ambiguous if reasonable minds could be uncertain as to " 'the general scope and meaning of the statute when all of its provisions are examined.' " *Id.* (quoting *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996)). We are primarily guided by what the legislature said, not what it should or might have said. *Carolan*, 553 N.W.2d at 888. Aside from the express language used in the statute, we also consider the overall object sought to be attained, the statute's purpose and

underlying policies, and the consequences of various interpretations. *McCullah*, 787 N.W.2d at 94–95. In the end, a criminal statute cannot be expanded beyond those circumstances intended by the legislature to be within the scope of the statute. *See State v. Hearn*, 797 N.W.2d 577, 587 (Iowa 2011) (recognizing the "time-honored rule that criminal liability cannot be expanded beyond express legislative terms by construction or implication").

In our search for legislative intent in this case, we first examine the legal history of the statute because it may shed light on whether the particular facts before us were intended to be governed by the current law. *See* 2B Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 50:1, at 156 (7th ed. 2008) [hereinafter Singer]. As with many other early criminal statutes, Iowa's sexual abuse statute was based on the common law. The common law declared it unlawful for a man to engage in sexual intercourse with a woman by force and against her will. Torcia, § 283, at 1. Over the years, statutes have expanded the common law crime to include additional specific circumstances or categories of nonconsensual conduct. Model Penal Code & Commentaries § 213.1 cmt. 1, at 276–77 (1980) [hereinafter Model Penal Code]. The first expansion was to specifically include children viewed by the law to be too young to effectively consent. *Id.* § 213.1 cmt. 1, at 276. This expansion occurred very early in history when an English statute expanded the crime to include sexual intercourse with a child under the age of ten years. *Id.* It occurred so early in time that it is generally viewed as part of the common law and was readily accepted into American law. Torcia, § 291, at 43.

Iowa followed the common law approach when it enacted its rape statute in 1851. *See* Iowa Code § 2581 (1851). This statute criminalized

sexual intercourse with a child under the age of ten or with any other female when "by force and against her will." *Id.*

Since that time, the Iowa legislature has built on the common law approach by expanding the crime to add more specific categories of offensive conduct. These categories have been aligned with those circumstances commonly recognized in other states and generally involve sexual intercourse with individuals who are unconscious, drugged, or mentally incompetent. *See* Iowa Code § 709.4. Today, Iowa's statute maintains its original common law standard of force and nonconsent, with only a slight alteration from the past: Iowa Code section 709.4(1) makes it a crime to perform a sex act "by force *or* against the will of the other person" and declares such conduct to be sexual abuse in the third degree.[4] Iowa Code § 709.4(1) (emphasis added). Our legislature changed the conjunctive "and" to "or" in 1921. *See* 1921 Iowa Acts ch. 192, § 1 (codified at Iowa Code § 12966 (1924)).

Iowa's sexual abuse statute then defines six additional categories of third-degree sexual abuse. *See* 4 Robert R. Rigg, *Iowa Practice: Criminal Law* § 6.24, at 224 (2010). The first category captures the circumstance when the other person "is suffering from a mental defect or incapacity which precludes giving consent." Iowa Code § 709.4(2)(*a*). The second category prohibits sex acts with a person who is twelve or thirteen years of age.[5] *Id.*

---

[4]Chapter 709 is a comprehensive set of laws generally defining the scope of sex acts that are deemed offensive. Along with third-degree sexual abuse, the law also criminalizes sex abuse causing another person serious injury as first-degree sexual abuse, classified as a class "A" felony. Iowa Code § 709.2. Second-degree sexual abuse is a class "B" felony and includes sexual abuse committed while using a dangerous weapon, sex acts with a person under the age of twelve, and sex acts aided and abetted by one or more other individuals and committed by force or against the will of the victim. *Id.* § 709.3. Several other categories of sex abuse that qualify as misdemeanors or class "D" felonies are also included in chapter 709. *See id.* §§ 709.12, .15–.16.

[5]A sex act with a child less than twelve years of age is prohibited as second-degree sexual abuse. Iowa Code § 709.3(2).

§ 709.4(2)(*b*). The third and fourth categories capture a variety of circumstances when the other person is fourteen or fifteen years of age and the defendant is a member of the same household, related by blood or affinity to the fourth degree, an authority figure, or four or more years older than the other person. *Id.* § 709.4(2)(*c*). The fifth category involves situations in which the other person is under the influence of a controlled substance that prevents consent, and the defendant reasonably knows the person is under the influence of the substance. *Id.* § 709.4(3). The sixth category criminalizes sex acts with a person who is "mentally incapacitated, physically incapacitated, or physically helpless." *Id.* § 709.4(4). While the categories describe fact-specific circumstances, each category continues to involve the absence of consent. Thus, consent remains the lynchpin of the crime, and the legislature has sought over the years to identify more specific circumstances of nonconsent while leaving the broader "against the will" standard in place to capture all circumstances of actual nonconsent. *See* 2A Singer § 47:17, at 378–79 (noting that, unless a contrary intention is apparent, when specific terms follow general terms, the general terms include everything embraced by the specific terms that follow along with things beyond the specific terms that are similar in nature though not expressly mentioned); *see also* 2A Singer § 47:25, at 429–35 (stating maxim of *expressio unius est exclusio alterius* applies in narrow circumstances and is to be disregarded when its application would "thwart the legislative intent made apparent by the entire act"). The structure of the statute does not foreclose psychological circumstances that could work to establish nonconsent.

Further evidence of the legislative intent for psychological circumstances to be included in "against the will" language of Iowa Code section 709.4(1) can be found in the context of the surrounding statutes in

chapter 709. *See Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 82 (Iowa 2010) (noting "we interpret statutes in their context"). Our legislature has specifically declared in section 709.5 that physical resistance is not required "to establish that an act of abuse is committed by force or against the will of a person." Iowa Code § 709.5. Thus, nonconsent under the "against the will" language of section 709.4(1) does not rely on the existence of physical resistance. Instead, the legislature expressed its intention that "the circumstances surrounding the commission of the act" be considered in determining whether the act was "by force or against the will of the other." *Id.* We have said that this language "means *all* the circumstances, subjective as well as objective" are considered. *State v. Bauer*, 324 N.W.2d 320, 322 (Iowa 1982).

Additionally, section 709.1(1) declares the meaning of the phrase "against the will of the other" includes acts done while the person is in a state of unconsciousness. Iowa Code § 709.1(1). Clearly, the "against the will of another" standard seeks to broadly protect persons from nonconsensual sex acts, even under circumstances showing the victim had no opportunity or ability to consent due to the inherently coercive nature of the circumstances. Likewise, a psychological inability to consent broadly protects individuals from nonconsensual sex when particular circumstances have rendered that person incapable of consenting to the sexual advances of a particular person. Importantly, the statute as a whole expresses no limit on the conduct or circumstance that can be used to establish nonconsent under section 709.4(1). *See id.* § 4.2 (directing courts to liberally construe the provisions of the Code "with a view to promote its objects and assist the parties in obtaining justice"); *see also Hearn*, 797 N.W.2d at 587 (noting in our interpretation of statutes we "decline to narrow a broad legislative

formulation by implying or constructing limitations not present in the statute and undercutting its obvious public purpose").

The overall purpose of Iowa's sexual abuse statute is to protect the freedom of choice to engage in sex acts. *See State v. Sullivan*, 298 N.W.2d 267, 271 (Iowa 1980). The sex abuse statute exists to protect a person's freedom of choice and to punish "unwanted and coerced intimacy." Model Penal Code § 213.1 cmt. 4, at 301. A person who imposes a sex act on another by force or compulsion under any circumstance violates the other's protected interest. *Id.* Yet, nonconsent includes both consent that is nonexistent and consent that is ineffectual, and these circumstances have been largely assimilated into the statute to account for its present expanded categories of rape. *Id.* Nevertheless, "the unifying principle among this diversity of conduct is the idea of meaningful consent." *Id.* Consent precludes rape, which conversely means the law of rape focuses on "imposition by the actor under circumstances where there is an actual failure of consent or where the law is prepared to characterize an actual consent as incompetent." *Id.* Accordingly, sexual abuse today remains a crime predicated on sex acts done by imposition. *Id.* This concept of imposition has not been narrowed in any way by our legislature over the years, but it remains at the heart of the statute to capture both case-specific circumstances of an "actual failure of consent" as well as circumstances when the legislature has declared "consent as incompetent" or nonexistent. *See id.*

This statutory approach to nonconsent under section 709.4(1) is consistent with our prior cases. In *Bauer*, the defendant entered the home of the victim through a window during the early morning hours, while the victim was sleeping on a living room sofa. 324 N.W.2d at 321. The victim awoke after the defendant began kissing her. *Id.* He then removed her

clothing and engaged in sexual intercourse. *Id.* The defendant expressed no threats and used no force, other than what was necessary to accomplish the sexual intercourse. *Id.* The victim never physically resisted the defendant and voiced no objections to his actions. *Id.* Instead, the victim made a conscious decision to refrain from any outward protest because she feared such resistance would place her in greater danger. *Id.* The victim felt "paralyzed," unable to resist the defendant's advances, as she remembered a past incident involving another woman found murdered in a ditch. *Id.* at 321–22. We affirmed the conviction for sexual abuse and rejected the claim by the defendant that the circumstances did not amount to "force against the will" of the victim. *Id.* at 322. We found the circumstances produced fear in the mind of the victim that subjectively rendered her incapable of protesting and resisting, which supported a finding that the advances of the defendant were imposed against her will. *Id.*

Importantly, *Bauer* illustrates that the mental state of the victim is a proper circumstance to consider in determining if a sex act is nonconsensual. The paralysis felt by the victim in *Bauer* is compatible with the evidence of the fragile and frozen emotional state of Mindy brought about by her unique and traumatizing history with Meyers as described by the expert witness in this case.

More directly, we recently observed the legislature never intended to limit the circumstances that could be used to vitiate consent under the "by force or against the will" standard of section 709.4(1) by specifically listing the circumstances or categories under which consent may be vitiated. *State v. Bolsinger,* 709 N.W.2d 560, 565 (Iowa 2006). Thus, we held that fraud in fact could be used to establish nonconsent under section 709.4(1), even though it was not included as a specific category of nonconsent under the statute. *Id.* at 564–65. The approach we have taken in our prior cases does

not exclude consideration of a victim's psychological circumstances that may vitiate consent.

Additionally, other states have considered whether the statutory element of "force" required to support sexual abuse can include psychological force. In *Commonwealth v. Rhodes*, 510 A.2d 1217, 1226 (Pa. 1986), the Pennsylvania Supreme Court held the state's rape statute's reference to "forcible compulsion" includes "not only physical force or violence but also moral, psychological, or intellectual force used to compel a person to engage in sexual intercourse against that person's will." The analysis of force by the Pennsylvania court focused on "the totality of the circumstances." *Id.* The court cited various factors for the analysis, including

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.* The Pennsylvania legislature codified the court's definition of "forcible compulsion" soon after the court's decision. 18 Pa. Cons. Stat. § 3101 (2008) (defining "forcible compulsion" as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied"); *see also* Dan M. Kahan, *Culture, Cognition, and Consent: Who Perceives What, and Why, in Acquaintance-Rape Cases*, 158 U. Pa. L. Rev. 729, 742 & n.45 (citing and describing the 1995 Pennsylvania act amending the statute defining "forcible compulsion"). Rhode Island also recognizes psychological coercion as a form of constructive force, but only when the coercion amounts to a threat. *State v. Burke*, 522 A.2d 725, 735 (R.I. 1987) ("A threat may consist of the imposition of psychological pressure on one

who, under the circumstances, is vulnerable and susceptible to such pressure.").

Similarly, Ohio courts consider the relative age and relationship of the parties to determine whether psychological force is sufficient. *See State v. Eskridge,* 526 N.E.2d 304, 306 (Ohio 1988). However, Ohio's approach to psychological force was limited in a subsequent case, *State v. Schaim,* 600 N.E.2d 661, 665 (Ohio 1992). In *Schaim,* the court determined that a father who had a history of sexual acts with his adoptive daughter was not guilty of raping her when she became a twenty-year-old adult. *Schaim,* 600 N.E.2d at 665–66. The court held the distinction between psychological force and physical force was apparent when the victim was an adult child because an adult child "is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources." *Id.* at 665. The court firmly held the age of the victim child was significant because

> a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements of forcible rape. . . .
>
> . . . [A] pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her.

*Id.*

Finally, the consideration of psychological circumstances is consistent with academic commentary examining the issue. Some scholars have opined the definition of "force" should include psychological force akin to parameters set out in contract law. Ann T. Spence, *A Contract Reading of Rape Law: Redefining Force to Include Coercion,* 37 Colum. J.L. & Soc.

Probs. 57, 57 (2003) [hereinafter Spence] (suggesting contract theory be extended to criminal law definition of "force"); *see also* James T. McHugh, *Interpreting the "Sexual Contract" in Pennsylvania: The Motivations and Legacy of* Commonwealth of Pennsylvania v. Robert A. Berkowitz, 60 Alb. L. Rev. 1677, 1686 (1997). In *Bolsinger*, we held "[f]raud in fact vitiates consent" to sex. *Bolsinger*, 709 N.W.2d at 564. Similarly, contract principles applicable to finding adequate agreement between people in other situations may aid in understanding whether there has been an equal agreement to sex. Spence, 37 Colum. J.L. & Soc. Probs. at 57; *see also* Susan Estrich, *Rape*, 95 Yale L.J. 1087, 1120 (1986) (urging adoption of standard that prohibits fraud to procure sex as contract law forbids fraud to procure money). For example, "the doctrine of undue influence proscribes the use of emotional or psychological force as a means of unfair persuasion in a close relationship. . . . [and] [t]he doctrine of unconscionability can void contracts that are unfair or reflect an imbalance in bargaining power." Spence, 37 Colum. J.L. & Soc. Probs. at 70. While there are also significant differences between rape and illegal contracts, the doctrines may be nevertheless helpful as a guide for conceptualizing the important freedom of each individual to consent to sex that is protected by Iowa Code chapter 709. *Id.* at 75.

Considering the legislative history of Iowa's sexual abuse statute, the language and purpose of the statute, our prior cases interpreting the statute, and the persuasive authority from other jurisdictions and scholars on the topic, we conclude psychological force or inability to consent based on the relationship and circumstance of the participants may give rise to a conviction under the "against the will" element of section 709.4(1). This statutory element considers all circumstances that establish actual nonconsent, including any psychological circumstances particular to the

participants. Thus, we turn to consider the facts in this case to decide if the evidence was sufficient to support a conviction. In doing so, we follow our long-standing admonition to review the evidence in a light most favorable to upholding the verdict. *State v. Kraklio*, 560 N.W.2d 16, 17 (Iowa 1997).

In assessing the evidence in this case, we note section 709.4(1) does not require evidence of both force and lack of consent, but one or the other. Iowa Code § 709.4(1). Nevertheless, meaningful consent is the important inquiry, and this inquiry normally takes into account circumstances indicating any overreaching by the accused, together with circumstances indicating any lack of consent by the other person.

In this case, the State's expert, Dr. Hutchison, rendered an opinion based on the facts and inferences from the evidence established at trial that a person in Mindy's situation would have been unable to consent to a sex act with Meyers. Expert testimony may be used to assist a fact finder in determining a victim's state of mind as long as the expert does not testify to the ultimate fact of the defendant's guilt or innocence. *See State v. Griffin*, 564 N.W.2d 370, 374–75 (Iowa 1997) (recognizing evidence of battered women's syndrome from expert is admissible to show psychological reason for victim's recanting of accusation and refusal to testify against defendant); *see also State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997) (holding expert witnesses "may express opinions on matters explaining the pertinent mental and physical symptoms of the victims of abuse" if expert testified about the effects of the victim's mental condition on her ability to tell the truth); *State v. Gettier*, 438 N.W.2d 1, 6 (Iowa 1989) (approving expert testimony linked to an explanation of PTSD and the typical reaction of a rape victim); *State v. Chancy*, 391 N.W.2d 231, 234 (Iowa 1986) (noting in third-degree sex abuse trial that "there seems to be no question about the potential of psychological evidence in the present case to assist the trier of fact[, and] [t]he victim's lack

of mental capacity is . . . key element in the crime charged"). We give the district court's assessment of the credibility of Dr. Hutchison's opinion regarding Mindy's mental state considerable deference. *In re Det. of Barnes*, 689 N.W.2d 455, 457 (Iowa 2004).

Based on the history between Meyers and Mindy, together with the expert testimony at trial assessing all the surrounding facts and circumstances in this case, we conclude substantial evidence supports the finding by the district court that the sex acts were performed at a time when Mindy was unable to consent to sex with him. Meyers did not challenge the admissibility of the expert testimony, only that it was insufficient to support a conviction. Yet, all the facts and circumstances presented at trial, including the expert testimony, were sufficient for a fact finder to infer the sex acts were nonconsensual.

There was evidence that Meyers pursued and engaged in a sexual and romantic relationship with his high-school-age stepdaughter while she was in a very vulnerable psychological state. Her vulnerability was not only due to her crack cocaine addiction, her estrangement from her mother, and her need for support and shelter, but it was also based on the history of sexual and physical abuse inflicted by Meyers in the past. In addition to Mindy's condition, Meyers was a controlling person and Mindy's father figure. All the circumstances together, including the disparity in age between Meyers and Mindy, the background and history of their relationship, the authority exercised by Meyers, the circumstances leading up to the establishment of a romantic relationship, and Dr. Hutchison's opinion concerning the inability of Mindy to consent in light of all the circumstances, support a finding that

the sex acts engaged in between Meyers and Mindy were "by force or against the will" of Mindy.[6]

## IV. Sufficient Evidence of Lascivious Conduct with a Minor.

To support the charge of lascivious conduct with a minor, the State must show (1) Meyers was over eighteen years old; (2) Meyers was in a position of authority over Mindy; (3) Mindy was under the age of eighteen; and (4) Meyers forced, persuaded, or coerced Mindy to disrobe or partially disrobe for the purpose of satisfying the sexual desires of either of them. Iowa Code § 709.14. Meyers argues there was insufficient evidence to establish he forced Mindy to "disrobe or partially disrobe" for the purpose of satisfying his sexual desires. The State presented evidence of Meyers' age and of Mindy's age as well as evidence that Meyers was Mindy's father figure from the time Mindy was six years old and that he was the "controlling figure" in the home at that time. It also presented Meyers' March 11 letter describing Mindy's body, along with the testimony of witnesses supporting the existence of a sexual relationship between Mindy and Meyers. For the same reasons we find substantial evidence exists to show Meyers performed sex acts against Mindy's will, we also find the district court did not err in

---

[6]Meyers argued on appeal that inclusion of psychological factors to negate consent in the "mental defect or incapacity" category of sexual abuse would render the statute too broad and presents a serious danger of overcriminalization of sexual relationships viewed socially unacceptable but not intended to be punished under the statute. While we do not address the argument as it pertains to the mental defect or incapacity category, we recognize the same concern has been voiced with regard to an "against the will of" standard as well. *See* Donald A. Dripps, *Beyond Rape: An Essay on the Difference Between the Presence of Force and the Absence of Consent*, 92 Colum. L. Rev. 1780, 1792 (1992) (advising against application of a broad definition of lack of consent to avoid "the sweeping criminalization of sex"); *see also* Model Penal Code § 213.1 cmt. 4, at 302 (noting an overemphasis on nonconsent may unintentionally overbroaden the law). While this claim might have appeal under different facts, it does not under the specific facts and circumstances of this case. The facts of this case fall within Iowa's criminal statute prohibiting sex acts "by force or against the will of the other."

finding sufficient evidence Meyers coerced Mindy to disrobe to satisfy his sexual desires.

## V. Meyers' Pro Se Claim.

Meyers has filed a pro se brief in this case, asserting the district court erred by failing to rule on a motion to dismiss in this case. Meyers claims this failure violated his constitutional right to due process. No motion to dismiss appears in the record before us on this case. Issues on appeal not raised in the district court are deemed waived. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002*)*. Consequently, we do not address a violation of Meyers' constitutional right to due process.

## VI. Conclusion.

After consideration of all the issues presented for our review, we affirm the judgment and sentence of the district court and affirm the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Mansfield, J., who takes no part.