# IN THE COURT OF APPEALS OF IOWA

No. 15-2104
Filed April 19, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**PETE JASON POLSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

The defendant appeals from his convictions for attempt to commit murder, assault with intent to inflict serious injury, two counts of willful injury causing serious injury, intimidation with a dangerous weapon, possession of a controlled substance with intent to deliver (marijuana), and failure to possess a tax stamp. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kelli Huser, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Pete Polson appeals from his convictions for attempt to commit murder, assault with intent to inflict serious injury, two counts of willful injury causing serious injury, intimidation with a dangerous weapon, possession of a controlled substance with intent to deliver (marijuana), and failure to possess a tax stamp. On appeal, Polson raises a number of issues; he claims (1) the court abused its discretion when it denied his request to substitute counsel one business day before trial; (2) there was not sufficient evidence to support the jury's verdict regarding his specific intent; (3) the weight of the evidence does not support the jury's verdict; and (4) trial counsel was ineffective for failing to retain an expert witness on the effects of psychotropic drugs and failing to move to sever the shooting incident charges from the drug charges.

**I. Background Facts and Proceedings.**

On November 17, 2014, at approximately 6:30 a.m., Mark Mitchell left his home to start his vehicle, which was sitting in the driveway. As Mitchell walked toward his truck, he was approached by a man who pulled a gun out of his pocket and shot Mitchell in the stomach. The man fired a second shot, but the second bullet missed Mitchell and entered the home. Mitchell was then able to retreat back into the house, and Mitchell's young son called 911. The first officers were dispatched at 6:32 a.m.

Nearby, Zachary Whitehill had just pulled over to the side of the road because he was having difficulty seeing due to snow blowing up and freezing his windshield wipers. Whitehill exited his vehicle, and as he was reaching for the wiper blades, he was shot twice—once in the back and once in the neck. The

shooter then left the scene, and a concerned citizen stopped and called 911. Whitehill reported the shooter had driven off in a green Ford Explorer with Iowa license plates. Officers were dispatched to the second scene at 6:36 a.m.

Matthew Stephenson had stopped at the home of his children's grandparents in order to drop off his son's school bag. Stephenson left his vehicle running, and as he was returning to the truck, a number of shots—four or five—rang out. Stephenson was able to make it into the home without being hit, but a number of bullets missed him by mere inches. Stephenson called 911 at 6:44 a.m., and he reported the shooter was driving an older green SUV and wearing a bright "hunting" orange sweatshirt.

Around 7:00 a.m., Trooper Brian Moses was driving in his squad car near the location of the three shootings when he noticed a man matching the shooter's description wearing an orange sweatshirt and driving a green Ford Explorer. The vehicle drove past Moses, and Moses lost sight of it for a short time. However, he and another trooper, Andrew Klein, located, and were able to block, the vehicle. Trooper Klein ordered the driver out of the vehicle, and he complied. Once they had the driver, they were able to identify him as Pete Polson. Stephenson was brought to the scene shortly thereafter, and he identified Polson as the man who had shot at him "without a doubt."

Officers searched the area Polson had been driving when Moses lost sight of him, and they found a handgun in the ditch. Although there had been a snowstorm a couple days earlier, the gun was not covered in snow. Later testing confirmed that Polson's DNA was on the handgun. Additionally, casings found at each of the scenes were tested and determined to have been shot from the

recovered handgun. Polson's orange sweatshirt was also tested, and gunshot residue was found on it.

Later the same day, officers conducted a search of Polson's residence. In it, they found in excess of fifteen pounds of marijuana, as well as some packaging materials and scales. Additionally, a couple of spoons with methamphetamine residue were recovered.

Special Agent Matthew Clifton interviewed Polson at the police station on the day of the shootings. When asked, Polson responded he had not used narcotics or drugs for a couple years. Additionally, Polson said he did not feel intoxicated at the time. Clifton testified that based on his observations of Polson and his demeanor, Clifton believed that Polson was not intoxicated at the time.

On December 22, 2014, Polson was charged by trial information with a number of crimes stemming from November 17. Polson was charged with three counts of attempted murder (count I: Mark Mitchell; count II: Zachary Whitehill; count III: Matthew Stephenson); two counts of willful injury causing serious injury (count IV: Zachary Whitehill; count V: Mark Mitchell); one count of intimidation with a dangerous weapon (count VI); one count of conspiracy to deliver a controlled substance (marijuana) (count VII); one count of possession of a controlled substance with intent to deliver (marijuana) (count VIII); and failure to affix a tax stamp (count IX).

In early October 2015, Polson filed a notice that he intended to rely on the defense of intoxication.

Jury orientation took place on the morning of Friday, October 9; the trial was scheduled to start the following Monday. Then, on Friday afternoon, the

court held a hearing on Polson's pro se motion to dismiss or substitute his appointed trial counsel. The court stated, "I'll go ahead and have you [Polson] make any statements you would like, and then I'm going to have [trial counsel] respond to that." Polson then stated:

> I just feel that [trial counsel] doesn't have my best interests, you know. He's dropped the ball on a lot of things. It's all there in the affidavit. He's—we talked about filing for certain things, and he hasn't done it. Just, you know—and I just feel that a lot of things haven't gone like he says they were going to and he doesn't have my best interests, Your Honor. I don't feel comfortable going to trial with him. So that's it.

Polson's trial counsel then responded:

> I can tell the Court, particularly in reviewing Mr. Polson's affidavit at the end, I have visited him at the jail more than two times, and those have been at least a couple of longer occasions. We've also had multiple chances to talk over the iWeb. The jail has a system set up that's i-W-e-b to do internal communications with clients, and those are secure. So they are not recorded or maintained by the jail. We have had multiple opportunities to do that.
> We have filed a motion for discovery and had discovery. We have filed notice of intent to take depositions, have deposed all of the witnesses that the State has except for one that was just recently added. I don't know if the county attorney had a chance to get that person subpoenaed, but we'll talk about whether that is going to be an issue or not. We've had extensive plea negotiations on this case, with a final offer that is sitting out there that at this point Mr. Polson is not in agreement with.
> I've advised my client about what I think the likely outcome of his trial is going to be. I've advised—I have balanced that against what the plea offer is, and I've given him advice as to whether or not in my opinion he should take that, keeping in mind that it is his decision. And as ever, I will zealously advocate for him at trial if we go to trial.
> Trial is scheduled for Monday—or for Monday. We had had some conversation about filing a motion for change of venue. That is a strategic decision to be made by the attorney. And at times I've considered filing that, and we've talked about that, but in the end, looking at the facts of this case, getting some discussion and getting—and talking with other attorneys to get a feel from what their opinions would be, I have chosen not to file that motion for change of venue, and I haven't filed it.

> Also, we've talked about prospective defenses, and I filed one that I believe is most appropriate for this case, that's a defense of intoxication.
> So, Judge, I am not asking to withdraw. Trial is scheduled for Monday. I think I can still try this case. I leave that up to the Court's discretion.

The State then weighed in, indicating that it had a number of conversations with trial counsel, that trial counsel appeared to have reviewed all reports and videos before depositions (based on the questions counsel asked), and it resisted any motion to continue that would be necessary if a new attorney was to be appointed.

The court then ruled from the bench.[1] The court stated, "I find that you may have some disagreements as to some strategy, but I don't think that's a complete breakdown of communications." The court also considered the "efficiency issues," noting the case had been pending a long time and that a lot of work and resources had taken place to prepare for the trial that was scheduled to begin on the next business day. The court denied Polson's motion.

The trial began on October 12, 2015. A number of police officers, troopers, and special agents who participated in the investigation testified, including Trooper Moses, Trooper Klein, Special Agent Clifton, and Special Agent Anthony Birmingham, who each had contact with Polson on November 17 and opined Polson was not under the influence when they interacted with him.

Polson's former girlfriend testified in his defense at trial. She testified that she knew Polson to use methamphetamine—usually with syringes. Oftentimes, Polson would hallucinate and become paranoid after using methamphetamine;

---

[1] The court also later filed a written ruling, reiterating and supplementing the previous ruling.

she would later report to him what he had done while he was high, and Polson would be surprised to learn of his actions. She saw Polson on the evening of Friday, November 14, 2014, but she left because he was talking about "partying." She next saw him, in passing, at the police station on November 17. She got the impression he "seemed lost" when she saw him there. On cross-examination, the ex-girlfriend testified she could tell when Polson was high based on his body language; he would not be able to sit still or hold a conversation. Additionally, she stated Polson was not able to drive well when he was high.

Billi Jo Bailey was with Polson the weekend before the shootings. She testified she saw Polson use methamphetamine a number of times throughout that weekend, with the last time being around 10:30 or 11:00 p.m. on November 16. Afterward, Polson was acting jealous and antsy, and he was not making any sense; he was convinced Bailey was hiding Polson's ex-girlfriend under her bed. Bailey then made Polson leave her house. She testified she saw the methamphetamine before he ingested it and it looked the same as other methamphetamine; Bailey also used methamphetamine that night, and she did not have an atypical reaction. After the shootings, police officers questioned Bailey, and she told them she and Polson had ingested marijuana on November 16. She first mentioned they had used methamphetamine approximately one to two months before the trial. Additionally, when asked, Bailey testified Polson was a "horrible driver" when he was high; he would drive fast and erratic, just like his behavior.

Polson testified in his own defense. He stated he was "slamming" methamphetamine—injecting it with a syringe—throughout the weekend before

the shootings. He ingested methamphetamine the final time around midnight on the morning of November 17. He "knew right then something was wrong" and "it didn't even taste like dope." According to Polson, the next thing he remembers after injecting methamphetamine is cops being all around him. He testified he could not and did not form the specific intent to harm anyone. He has a "splotchy" memory of the next three or four days; he remembers being placed in a police vehicle after he was apprehended, but he does not remember being asked at the station if he had been using drugs, and he does not remember calling his ex-girlfriend from jail and telling her it was all a "big misunderstanding" and he "can beat this shit."

The case was submitted to the jury on Friday, October 16. On October 21, the jury returned with its verdict. The jury found Polson guilty of count I and counts IV-XI, as charged. As to counts II and III, the attempted murder of Whitehill and Stephenson, respectively, the jury found Polson guilty of the lesser-included offense of assault with intent to inflict serious injury.

On December 9, Polson was sentenced to a term of incarceration not to exceed fifty-five years.

Polson appeals.

## II. Standards of Review.

We review the district court's denial of Polson's request for substitute counsel for an abuse of discretion. *See State v. Tejada*, 677 N.W.2d 744, 749 (Iowa 2004).

We review challenges to the sufficiency of the evidence presented at trial for correction of errors at law. *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa

2011). In doing so, we examine the evidence in the light most favorable to the State to determine if the finding of guilt is supported by substantial evidence in the record. *Id.*

As here, when a defendant claims the district court should have granted his motion for new trial based on a claim the verdict was contrary to the weight of the evidence, we review for an abuse of discretion. *See State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006). We do not decide anew the underlying question of whether the verdict is against the weight of the evidence. *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003).

Because claims of ineffective assistance stem from a defendant's constitutional right to counsel, we review such claims de novo. *See State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

**III. Discussion.**

**A. Substitute Counsel.**

Polson maintains the district court abused its discretion when it denied his motion to substitute appointed counsel one business day before trial was scheduled to start. In his pro se motion for new counsel, Polson claimed his trial counsel had multiple murder trials he was trying and had "little or no time for [Polson's] case," had not filed for a change of venue, had filed for an intoxication defense instead of a diminished capacity defense—as Polson wanted, and had rarely met with Polson. He also claimed counsel "failed to investigate, fail[ed] to file pretrial motions to preserve evidence, interview witnesses, and to retain expert witnesses on psychotropic drugs and their effects."

While the Sixth Amendment guarantees a defendant the right to counsel, it does not guarantee "a meaningful relationship between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 19 (1983). Rather, in cases where a defendant is represented by a court-appointed attorney and requests substitute counsel, the defendant must present "sufficient cause to justify replacement" to the court. *Tejada*, 677 N.W.2d at 749. "Sufficient cause includes 'a conflict of interest, irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'" *State v. Lopez*, 633 N.W.2d 774, 779 (Iowa 2001) (citation omitted). Additionally, the court must balance "the defendant's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.* (citation omitted). "The court should not permit a defendant to manipulate the right to counsel to delay or disrupt the trial." *Id.* "[T]he court has considerable discretion in ruling on a motion to substitute counsel made on the eve of trial." *Id.*

Here, the court set a hearing on Polson's pro se motion within a day of receiving it. At the hearing, the court gave Polson the opportunity to "make any statements [he] would like." Many of the statements made by Polson were general in nature—claiming his attorney "dropped the ball on certain things" and "a lot of things haven't gone like he says they were going to." A number of Polson's complaints appeared to be based on disagreement over strategic decisions. Other complaints—that his attorney had not investigated, filed pretrial motions, or interviewed witnesses—were just inaccurate. As such, the district court found, "I find that you may have some disagreements as to some strategy, but I don't think that's a complete breakdown of communication." We agree.

While Polson and his trial counsel were not in complete agreement, there is no indication there had been a complete breakdown in communication between the two. *Cf. Tejada*, 677 N.W.2d at 752 ("As a general matter . . . to prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." (quoting *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002))).

Moreover, trial was scheduled to begin one business-day later, and the jury panel had already had orientation and completed the jury questionnaire. Allowing Polson to substitute counsel would have undoubtedly disrupted and delayed the judicial process. "Trial court discretion is often accorded where, because of proximity to the trial process, the trial court is in as good or better position than the appellate court to make a determination in accordance with the demands of justice. *State v. Gartin*, 271 N.W.2d 902, 910 (Iowa 1978).

Polson also contends that he did not engage in a meaningful colloquy with the district court, and he was not provided the opportunity to show sufficient cause for the substitution of counsel. He maintains the district court should have made "a proper inquiry" into his concerns, and he compares his facts to those of *Tejada*. Polson does not elucidate what a "proper inquiry" entails, but we understand his claim to be that the district court should have asked him more specific questions about his complaints. *Tejada* does not proscribe what the court's inquiry must look like; it just requires the court to make one once a defendant requests substitute counsel. 677 N.W.2d at 750 ("[W]e . . . now explicitly recognize that there is a duty of inquiry once a defendant requests

substitute counsel on an account of an alleged breakdown in communication."). Additionally, in *State v. Lopez*, 633 N.W.2d 774, 779–81 (Iowa 2001), our supreme court was asked to determine if the inquiry the court made after the defendant requested new counsel "was adequate." The supreme court noted the trial court had "inquire[d] of defense counsel as to whether he had adequately prepared for trial and whether there was any disagreement with the planned strategy," and "more important[ly], . . . ask[ed] [the defendant] to explain any communication problem." *Id.* at 780–81. The court found the inquiry was adequate because the court gave the defendant "ample opportunity to explain the alleged conflict between the defense counsel and [the defendant]—an explanation [the defendant] utterly failed to give." *Id.* at 781.

Because Polson was given the opportunity to have a meaningful colloquy with the court about his request for substitute counsel, and because he did not establish sufficient cause to justify the replacement of counsel on the eve of trial, the district court did not abuse its discretion in denying his request.

**B. Sufficiency of Evidence.**

Polson maintains there was not substantial evidence in the record to support his convictions stemming from the shootings because the State had not shown Polson has the specific intent to commit the crimes of attempted murder, assault with intent to inflict serious injury, and willful injury causing serious injury.

In considering the evidence in the light most favorable to the State*, see Meyers*, 799 N.W.2d at 138, there was plenty of evidence to overcome Polson's intoxication defense. The defense requires "a high level of intoxication to support a finding of no specific intent." *State v. Guerrero Cordero*, 861 N.W.2d 253, 259

(Iowa 2015), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 (Iowa 2016).

> Intoxication is a matter of degree. . . . The law does not specify the degree or the percentage of intoxication essential to sustain this defense, but it does require that it be such as to render the accused incapable of the requisite specific intent. He may be under the influence of intoxicating liquor, but he will not be absolved of criminal responsibility if he still possesses mental capacity to entertain the intent. Mere intoxication is not sufficient. Neither is it enough that he had been drinking liquor.

*State v. Wilson*, 11 N.W.2d 737, 745–46 (Iowa 1943). While Polson claimed he was so intoxicated as to be unable to form specific intent, four of the State's witnesses—a number of whom had special training in detecting when someone is under the influence—testified that they did not believe Polson was under the influence at all on November 17, let alone to the extent that he was claiming.

Because Polson was not so incapacitated as to be unable to form specific intent, we consider "the facts and circumstances surround [his actions], as well any reasonable inferences to be drawn from those facts and circumstances, . . . to ascertain the defendant's intent." *State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999). Additionally, we note that intent "is seldom capable of being established with direct evidence." *Id.* "[W]e are guided by the maxim that defendants will ordinarily be viewed as intending the natural and probable consequences that ordinarily follows from their voluntary acts." *State v. Bedard*, 668 N.W.2d 598, 601 (Iowa 2003). Here, Polson drove his vehicle up to the home of Mark Mitchell, walked up toward Mitchell's home, and then shot Mitchell in the stomach before fleeing. Next, he drove up to Zachary Whitehill's stopped vehicle and shot Whitehill twice—once in the neck and once in the back, before

again fleeing and leaving Whitehill behind. Finally, Polson drove up to the curb of the home Matthew Stepheson was stopped at, waited for Stephenson to exit the home, and then shot at him four or five times from his vehicle. As Stephenson used his vehicle for cover and attempted to get back into the home, Polson continued to fire shots at him. Bringing a gun, using the weapon to shoot at three separate individuals multiple times—making contact with two—and fleeing the scene without regard for the victims constitutes substantial evidence Polson had the specific intent necessary for attempted murder, assault with intent to inflict serious injury, and willful injury causing serious injury. *Cf. State v. Hamilton*, 309 N.W.2d 471, 480 (Iowa 1981) ("[T]he general rule is that one who arms himself with the express purpose of shooting another cannot ordinarily claim the elements of first degree murder[, which includes specific intent] are lacking.").

**C. Weight of the Evidence.**

Similarly, Polson claims the district court abused its discretion in denying his motion for new trial; he maintains the weight of the evidence is contrary to the verdicts that required he form a specific intent. "A verdict is contrary to the weight of the evidence where 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (citation omitted).

Polson offered his self-serving testimony that he had no memory of the events surrounding the shootings—"coming to" right as officers surrounded him and ordered him out of his vehicle—but there was otherwise very little corroborating evidence. Bailey testified that she had used methamphetamine

with Polson approximately seven or eight hours before the shootings, but other testimony showed Polson typically "came down" from the influence of the methamphetamine within hours of taking it. Additionally, on cross-examination, it became clear Bailey originally told officers she and Polson had used marijuana the night before the shootings; she did not mention the use of methamphetamine until one or two months before trial—approximately nine months after the incidents occurred. Both Bailey and Polson's ex-girlfriend testified Polson was an erratic and unsafe driver when he was under the influence of methamphetamine, but there was no indication that he was driving in such a manner on the morning of November 17. Additionally, four of the State's witnesses testified that Polson's demeanor was not consistent with someone under the influence of methamphetamine. The jury was able to hear a phone call between Polson and his ex-girlfriend two days after the shootings, and in it, he did not tell her that he had no memory of the events, as he claimed at trial. Rather he stated that it was all a "big misunderstanding," that he had been pulled over while simply driving to work, and that he could "beat this shit." When asked at trial to explain the conversation, Polson testified he did not remember the phone call because it took him three or four days to come down from the drugs, and his memory during that time period was "splotchy."

Polson implied that the methamphetamine he took on November 16 was cut with another substance that caused him to have an atypical reaction to the drug. Bailey testified that the methamphetamine looked normal and that she did not have an atypical reaction. Polson then testified they had finished another bag of methamphetamine and he had started on a new purchase, which was why

he was the only one to have the reaction. Even if the jury believed Polson ingested methamphetamine that had been somehow tampered with, Polson's claim that he was too intoxicated to form specific intent is belied by his ability to drive, shoot with accuracy, and make the decision to dispose of the gun after an officer began following him.

It is the province of the jury to determine the credibility of witnesses and weigh the evidence accordingly. *See id.* ("The function of the jury is to weigh the evidence and 'place credibility where it belongs.'" (citation omitted)). Here, the jury found the evidence countering Polson's defense of intoxication more credible than the evidence supporting it, and we cannot say the district court abused its discretion in letting the jury's verdict stand.

### D. Ineffective Assistance.

Polson maintains he received ineffective assistance from trial counsel. Specifically, he maintains trial counsel should have retained an expert witness to testify about the effects of psychotropic drugs and counsel should have moved to sever Polson's shooting charges from his drug charges.

Claims of ineffective assistance are not bound by the traditional error preservation rules, but we rarely address such claims on direct appeal. *See State v. Ondayog*, 722 N.W.2d 778, 784, 786 (Iowa 2006). Here, both the State and Polson maintain that the record is adequate for us to decide the claims on direct appeal. We disagree. While the evidence Polson was the shooter was overwhelming, there was some question as to whether Polson was able to form the specific intent necessary to be convicted of the charges that resulted from the shootings. Based on the record before us, we do not know if there was an expert

that could offer the type of testimony that Polson now contends was necessary—testimony that would have buttressed his assertions about his lack of memory and ability to form intent several hours after using "cut" methamphetamine. The State maintains we should not be concerned by the lack of expert and what the testimony may have been because it was just a "strategic decision" by counsel, which is insulated from the ineffective-assistance analysis. But "we cannot automatically assume every alleged misstep was a reasonable strategy simply because some lawyer, somewhere, somehow, under some circumstances at some time would have done such a thing." *Id.* at 787.

Similarly, as to Polson's claim that his trial should have been severed, we believe the record is equally unclear. There are obvious reasons why a reasonably competent attorney would consider moving to sever the charges; Polson did not contest the drug charges—other than to testify his father was not part of a conspiracy to sell the drugs—and the evidence of the approximately twenty pounds of marijuana in Polson's home may have led the jury to decide Polson was untrustworthy or a just a "bad guy." *See State v. Blair*, 362 N.W.2d 509, 511 (Iowa 1985) ("The trial court is to order severance where the defendant shows his or her 'interest in receiving a fair trial uninfluenced by the prejudicial effects which could result from a joint trial [are] outweighed [by] the State's interest in judicial economy.'" (alterations in original) (citation omitted)); *see also* Iowa R. Evid. 5.404 (excluding evidence of a defendant's crime, wrong, or other act to prove a person's character). Again, the State claims counsel *may* have chosen not to request that the trial be severed in order to emphasize Polson's drug problem, thereby supporting his intoxication defense. We note that the drug

charges involved marijuana and Polson's intoxication defense relied on his use of methamphetamine. Additionally, the fact that counsel may have made a strategic decision is not sufficient to defeat a claim of ineffective assistance. *See Ondayog*, 722 N.W.2d at 786–87. The State also argues Polson cannot establish he was prejudiced even if counsel should have filed a motion to have the charges severed into two trials because "the evidence was strong." But whether the jury believed Polson's intoxication defense was based almost entirely on whether the jury found Polson to be a credible witness, and we cannot say whether the uncontested drug charges played a role in shaping the jury's decision about Polson's credibility.

These issues are preserved for possible future postconviction proceedings where the record can be more fully developed.

For all the foregoing reasons, we affirm.

**AFFIRMED.**