# IN THE COURT OF APPEALS OF IOWA

No. 21-0458
Filed May 11, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DEAN ALAN HETTINGER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Fayette County, Joel Dalrymple, Judge.

A defendant appeals his convictions for murder in the first degree and child endangerment resulting in death, alleging the evidence does not support the convictions and the district court should have granted his motion for a new trial. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Heard by May, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Dean Hettinger appeals his convictions for murder in the first degree and child endangerment resulting in death, in violation of Iowa Code sections 707.2(1)(e) and 726.6(4) (2018). He alleges the evidence does not support the convictions and the district court should have granted his motion for a new trial. Because we find substantial evidence supports the convictions and the district court did not abuse its discretion, we affirm.

### I. Background Facts and Proceedings.

This case involves the tragic death of an infant, H.S., by unnatural causes. H.S. was born in early April 2018 with methamphetamine in his system. After spending the first nine days of his life in the NICU, H.S. went home with his aunt Alicyn Kane. Because of her drug use, H.S.'s mother Amanda Smith (Kane's half-sister) was not allowed to be alone with her son. Kane resided with her boyfriend (defendant Hettinger) and the pair's six-month-old son, B.H. After H.S. went home, Smith also spent significant time in the household. Smith typically rotated between staying three or four days each with Kane and with her aunt in another nearby town. The plan was for H.S. to stay with Kane and Hettinger until Smith could be admitted to a rehabilitation facility where children were permitted.

Despite his initial NICU stay, H.S. presented as a healthy baby for the next couple weeks of his life. He did tend to spit up more than usual, and this caused Kane to bring him to the Emergency Room on two occasions—April 15 and 23. However, doctors and nurses confirmed at both visits that H.S. was healthy and did not need to be at the ER. They provided education on alternative feeding options to help with the spitting up. They also confirmed at trial that H.S. showed

no signs of methamphetamine withdrawal or physical abuse on either of these occasions. However, Hettinger and Kane argued in front of the examining nurse about being tired and loss of sleep.

The introduction of H.S. and Smith into the household caused tension in Hettinger and Kane's relationship. Hettinger expressed dissatisfaction with Smith's lack of physical and financial support for her child. On April 25, he complained via text message to Kane that Smith slept all day while H.S. cried all day and that he would not spend money on H.S. Hettinger was unemployed and was generally responsible for watching over both B.H. and H.S. during the day while Kane worked full-time at a daycare. In the evenings after work, Kane would typically take both children to her father's house nearby. During the last week of April, it was determined that Smith would not be getting admitted to the rehabilitation center as quickly as anticipated, so H.S. would need to stay a bit longer. The exact timeline was uncertain. Kane had expressed interest in adopting H.S. if long-term plans for reunification did not work out.

On April 26, Kane began taking B.H. to the daycare where she worked, so Hettinger was only caring for H.S. during the day. Smith's car broke down that morning on her way to her aunt's house. Hettinger and his friend Dwight Fratzke gave Smith a ride and moved the car. Smith did not return to Hettinger and Kane's home that week. That evening, Hettinger and Kane argued over text. Kane told Hettinger to leave for the night and stay with his mom. Hettinger refused to do so. Later, Hettinger texted Kane, "I might need to go to the hospital tonight . . . pretty sure I just OD'ed." When Kane did not immediately respond, Hettinger texted, "I'm so glad you don't care. Thank you." The pair continued arguing and concluded

with Hettinger stating, "you're leaving and moving out over me not wanting to spend my every waking moment with your sister and [H.S.]."

Kane testified that H.S. appeared normal and "just fine" before she left for work the next morning. Later, Hettinger texted that H.S. was out of food and that he was at Kane's workplace. Kane refused to see Hettinger but told him to go into B.H.'s daycare room to get food. They continued arguing via text, and Kane told Hettinger to transfer the truck into his name by Tuesday. Hettinger replied, "Sorry I was pissed off that I couldn't find his shit and he hasn't stopped crying. I'm just a little on edge right now." Kane again told him to go see his mom for the weekend and to "[l]iterally go the fuck away." Hettinger replied, "Fucking stop. I said I was sorry."

Not quite an hour later, Hettinger texted Kane that H.S. was "acting weird" and that he was grunting and jumpy. That afternoon, Hettinger visited his friend Fratzke's home. Fratzke thought H.S. looked pale and and sounded raspy. He could hear H.S.'s heavy breathing from approximately ten feet away. When Fratzke asked Hettinger what was wrong with the child, Hettinger replied simply that H.S. was a "meth baby". On a previous occasion, Hettinger told Fratzke that Kane wanted to adopt H.S., but Hettinger was against it. Fratzke's girlfriend Megan Bails watched H.S. while Hettinger was in the garage with Fratzke. She observed that H.S. was really quiet and did not move much. Hettinger also had a romantic relationship with Bails. She reported that Hettinger told her he was not happy to have H.S. in the home, that H.S. cried incessantly, and that "he couldn't wait for [Kane] to get home and take him." She also observed that this demeanor

was exclusively directed towards H.S. and not Hettinger's son B.H. Kane noticed H.S. was crying less than normal that evening.

On Saturday, April 28, Kane dropped H.S. off with a family friend who agreed to watch him for a few hours while she ran errands. During this time, Hettinger texted Kane, "truly I was hoping to have this weekend be for us as a family and be happy. . . sorry. Just not every day we get to be away from [H.S.]." The family friend reported that H.S. slept most of the day and was not colicky. She noticed that his eye would look to the side when she was feeding him. However, she did not mention the eye movement to Kane because she was not familiar with the child and speculated it could just be the way he was. Later on Saturday, Kane spent time at her father's home with both children. H.S. seemed less colicky than usual, sleepier, and had trouble keeping his eyes open. He also started exhibiting odd, slow-motion movements during his bath and did not wake up for his typical mid-night feeding.

H.S.'s odd behavior continued the next morning. At this time, Kane noticed one of H.S.'s eyes veering to the side. She called the hospital and was told to monitor the baby. She went to her father's house with both children. Later in the day, she observed that H.S. was nonresponsive and had minimal breathing, so she called for an ambulance to take him to the ER. He had a seizure in the ambulance. At the hospital, H.S. did not cry or react to having his blood drawn, and he had lost one pound since his last visit. He started to grunt, arch his back, and was inconsolable. H.S. exhibited signs of intracranial pressure and was transferred to the University of Iowa. Once there, doctors found subdural hemorrhages, which is bleeding in between the skull and the brain. A doctor

testified that the veering of H.S.'s eye was caused by brain "swelling so strong it's being pushed on the cranial nerve that controls the pupil. And it's a sign . . . [that] the brain is . . . dying essentially." The treating doctor opined that the injuries were consistent with traumatic brain injury and inflicted trauma. He testified that because there was no natural or infectious cause, the injuries could not have been self-inflicted, and there was no intervening accidental cause, his opinion was that child abuse would have been necessary to cause H.S.'s injuries.

Given that neurological recovery was unlikely, Smith made the decision to end life support for H.S. on May 6. H.S. died on May 27. An autopsy was conducted the following day. It revealed thirty-six symmetrical rib fractures on the front and back of the rib cage. No medical interventions during his hospital stay would have caused the rib fractures, which were consistent with a squeezing action and showed signs of healing. The autopsy also revealed intracranial hemorrhages with hypoxic-ischemic encephalopathy. The hemorrhages occurred before hospitalization. There were no natural disease processes that could explain the injuries. Because H.S. died four weeks after his injuries arose, "a lot of healing and changes had taken place, particularly in the brain, that altered the appearance by the time of the autopsy." For this reason, the doctor performing the autopsy could not say for certain what caused H.S.'s injuries, but her "findings could be compatible with" shaken baby syndrome. The autopsy found no indication that H.S. suffered any effects from his mother's methamphetamine use while pregnant.

Due to suspected abuse giving rise to H.S.'s injuries, Hettinger and Kane's child B.H. was removed from their home. Hettinger, Kane, and Smith all testified that they had never hurt or seen anyone hurt H.S. Hettinger became agitated and

nervous when he learned that Kane was offered a proffer agreement. On February 9, 2019, Kane received a text message from Hettinger in which he threatened to harm himself. Hettinger went on to write, "Also, I'm calling DCI tonight. I'm going to tell them I hurt [H.S.]. I don't want you and [B.H.] to continue to have to deal with this anymore." Kane contacted authorities regarding these messages.

Hettinger was arrested, and a jury found him guilty as charged. He did not testify at trial, but he gave two recorded interviews to law enforcement shortly after H.S's hospitalization. After trial, Hettinger challenged the sufficiency of the evidence with a motion in arrest of judgment and filed a motion for a new trial. The district court denied both motions at Hettinger's sentencing hearing, and he timely appealed.

## II. Review.

We review a challenge to the sufficiency of the evidence for the correction of errors at law. *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017). If substantial evidence supports the jury's verdict, we will uphold it. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* "Evidence raising only 'suspicion, speculation, or conjecture is not substantial.'" *Huser*, 894 N.W.2d at 490 (citation omitted). However, direct and circumstantial evidence are equally probative. Iowa R. App. P. 6.904(3)(p); *see also State v. Liggins*, 524 N.W.2d 181, 186 (Iowa 1994) ("Circumstantial evidence is not inferior evidence; both direct and circumstantial evidence are equally probative.").

As for motions for a new trial, we review for an abuse of discretion. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "A district court abuses its discretion when it exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable," which is true when the ground or reason "is not supported by substantial evidence or when it is based on an erroneous application of the law." *State v. Hill*, 878 N.W.2d 269, 272 (Iowa 2016).

### III. Discussion.

#### A. Motion in Arrest of Judgment.

Hettinger contends only that insufficient evidence exists to identify him as the party who injured H.S. No other element of either crime is at issue. As Hettinger points out, no eyewitness saw him injure the child. He argues that the State erroneously relied on his confessional text message indicating that he was going to contact DCI to prove that he was responsible for H.S.'s injuries.

A criminal conviction cannot rest on an out-of-court confession unless there is other proof that the defendant committed the crime. Iowa R. Crim. P. 2.21(4); *see also State v. Polly*, 657 N.W.2d 462, 467 (Iowa 2003). "Corroboration need not be strong nor need it go to the whole case so long as it confirms some material fact connecting the defendant with the crime." *Polly*, 657 N.W.2d at 467 (citation omitted). In fact, the corroboration need not "prove the offense beyond a reasonable doubt or even by a preponderance." *Id.* (citing *Smith v. United States*, 348 U.S. 147, 156 (1954). Even if individual circumstances are insufficient corroboration, we may assess the facts cumulatively to find a connection between the defendant and the crime. *See State v. Meyers*, 799 N.W.2d 132, 139 (Iowa

2011) ("Circumstantial corroborating evidence may include several facts that, when combined, support the admission.").

Here, Hettinger's text message is supported by medical and lay testimony, including other text messages he sent in the days leading up to H.S.'s hospitalization. Doctors testified that H.S.'s injuries were not naturally caused. Hettinger was alone with the child in an admittedly "pissed off" and "on edge" state when he texted that H.S. would not stop crying. Shortly thereafter, he texted that H.S. first began grunting and showing signs of distress. Medical personnel explained that grunting is a sign of pain and/or difficulty breathing in infants. They also explained that H.S.'s injuries most likely occurred within two days of arriving at the hospital, but possibly up to seventy-two hours prior. This timeline is consistent with Hettinger's time as a caretaker and observation of the grunting. Therefore, we find corroborating evidence indeed existed; whether it was sufficient to support Hettinger's confessional text message was a question for the jury. *See Liggins*, 524 N.W.2d at 187 ("The existence of corroborative evidence is a question of law for the court, but its sufficiency is ordinarily a question of fact for the jury." (citation omitted)).

We nonetheless take on the jury's role momentarily to assess whether a rational jury could find the record evidence proved guilt beyond a reasonable doubt. *See Sanford*, 814 N.W.2d at 615. As explained above, Hettinger had both opportunity and motive. He spent significant time alone with the child during the relevant period. He expressed frustration with H.S. and his caretaking responsibilities. Hettinger's friend Fratzke and his girlfriend Bails testified regarding Hettinger's dismissive and unfavorable demeanor towards H.S. Another

acquaintance who Hettinger knew through Fratzke, Mitchell Tafolla, also testified that Hettinger referred to H.S. as an "it," called him a "fucking meth baby," and said "all this f'ing thing does is cry." Kane testified that Hettinger was frustrated with Smith and the situation. Smith testified that she never witnessed H.S. display any seizure-like activity, unordinary eye movement, or other unusual, involuntary movement prior to his final hospitalization. With the exception of Hettinger's recorded interviews, "[t]he jury had a first-hand opportunity to view the credibility of the various witnesses and to assess the veracity of each party's version of events." *Fed. Land Bank of Omaha v. Emberton*, 460 N.W.2d 488, 492 (Iowa Ct. App. 1990).

Hettinger's recorded interviews also support the jury's conclusion given his dodging and inconsistent answers. Despite being interviewed twice within three days of H.S.'s hospitalization, Hettinger appeared confused about the sequence of events. When it was clear that the weekend of H.S.'s hospitalization was being questioned, Hettinger recounted events of a weekend when he was out of town and then acknowledged that this was a different weekend. He tried to place Smith at the home after the date that he helped with her car. He explained that Smith was generally caring for H.S. during the days while he cared for B.H. despite his text message describing Smith's lack of assistance. He also could not remember whether B.H. had been going to daycare for two days prior to the weekend of the hospitalization or for a week or two. H.S. had only been in the home for about two and a half weeks. After denying any intentional or accidental mishaps with H.S. at the first interview, Hettinger told the second interviewing officer that there was one time a week or two prior when he could have shaken H.S. a little bit because he

was shaking a bottle that he dropped and snatched up while holding H.S. Hettinger denied fighting with Kane but was adamant that Kane would not do anything to hurt a child.

Given Hettinger's opportunity and motive layered within the medical and lay testimony, we find a rational jury could find him guilty beyond a reasonable doubt. *See, e.g.*, *State v. Little*, No. 19-1062, 2021 WL 1400068, at *10 (Iowa Ct. App. April 14, 2021) (rejecting a sufficiency-of-the-evidence challenge because reasonable jurors could find the defendant was the perpetrator despite another individual having access to the child in question). Therefore, we affirm the district court's denial of his motion for judgment of acquittal.

*B. Motion for New Trial.*

We likewise affirm the district court's denial of Hettinger's motion for a new trial. Under Iowa Rule of Criminal Procedure 2.24(2)(b)(6), a district court may grant a motion for a new trial "[w]hen the verdict is contrary to law or evidence." "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Ary*, 877 N.W.2d at 706 (citation omitted). "This standard differs from the sufficiency-of-the-evidence [standard] because it requires the district court to independently weigh the evidence and consider the credibility of witnesses." *State v. Martin*, No. 19-0409, 2020 WL 4498038, at *8 (Iowa Ct. App. Aug. 5, 2020) (alteration in original) (citation and internal quotations omitted).

Here, the district court denied the motion in a ruling from the bench:

> At this stage it's a greater test, it's a different test, and it's—it requires more. So when faced with this new trial alleging a verdict that's against the weight of the evidence, the Court must view—or

must not view the evidence any longer in the light most favorable to the prosecution. Rather the Court now is required to determine whether the greater amount of credible evidence supports one side or the other.

. . . .

So considering that standard, recognizing it is a different standard; nonetheless, I cannot say when reviewing the evidence presented here and the arguments of the defense that the greater amount of credible evidence supports that of the defense.

I guess to the contrary, given—and considering all of the evidence presented by the State's witnesses in conjunction with, and I find to be particularly significant the statements of the defendant, albeit we had some discussions regarding those, the context of those, and those issues for the purposes of any appeal are preserved by the defense.

The court does find those admissions of the defendant and those statements of those—of the defendant to be significant in this case to indicate that—or at least to find that the greater amount of credible evidence does support this verdict, and ultimately the defendant's motion should fail and be denied at this time.

As the district court articulated the corrected standard and presented its independent evaluation of the evidence, it did not apply an improper legal standard. *See Ary*, 877 N.W.2d at 706. Moreover, substantial evidence supports the court's conclusion that the record evidence does not tip the scales against a guilty verdict. While it is true that multiple people had access to H.S. and the exact time of his injuries cannot be determined with certainty, significant circumstantial evidence points to Hettinger. We conclude the court did not abuse its discretion in denying Hettinger's motion for a new trial.

### IV. Disposition.

Because we find substantial evidence supports the jury's guilty verdicts and the district court did not abuse its discretion, we affirm the denial of Hettinger's motions in arrest of judgment and for new trial.

**AFFIRMED.**