**IN THE COURT OF APPEALS OF IOWA**

No. 24-0345
Filed December 18, 2024

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**WILLIAM EUGENE HARRIS,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Kossuth County, John M. Sandy,
Judge.

　　　　A defendant appeals his two convictions for third-degree sexual abuse.
**AFFIRMED.**

　　　　Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines,
for appellant.

　　　　Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney
General, for appellee.

　　　　Considered by Greer, P.J., and Buller and Langholz, JJ.  Sandy, J., takes
no part.

**LANGHOLZ, Judge.**

William Harris was convicted of two counts of third-degree sexual abuse after inappropriately touching two patients during their echocardiogram appointments. He appeals those convictions, alleging the State's evidence was insufficient to prove he performed a "sex act" when he touched either patient. But viewing the circumstances of both acts in the light most favorable to the State, substantial evidence supports his convictions.

During their appointments, Harris had both patients remove their pants and he inserted his finger into the first patient's vagina and touched the second patient's vaginal area inside her underwear. The patients were only scheduled to receive an echocardiogram—there was no reason Harris needed to remove their pants or touch below their chests. The jury could reject his explanation that he was performing a deep-vein-thrombosis screen as not credible, particularly given the lack of medical orders for either patient, his failure to document the screens in either patient's medical records, and his other unprofessional statements during the appointments. We thus affirm Harris's convictions.

I.

In early 2023, sixty-four-year-old Harris was working as a travel echocardiogram technician. He accepted a twelve-week contract to perform echocardiograms at a health facility in Iowa.

*The First Patient.* An eighty-five-year-old woman was having heart problems and needed an echocardiogram before receiving a pacemaker. After arriving for her test, she was taken to a small exam room and asked to remove her shirt and bra. She was then left alone in the room to change into a hospital gown.

Harris entered the room and positioned the patient on the exam table so she was lying down on her side. He lifted the gown and exposed the patient's left breast—this was unusual, as the patient had done these tests before and the prior technicians "pretty much kept [her] covered." Harris then started telling her he was lonely in Iowa and he was staying in a nearby motel (and which room he was in). He asked the patient to visit him for coffee, and when she said she did not drive at night, he offered to pick her up.

During the exam, Harris commented on the patient's legs, which appeared swollen, and asked if he could check her blood flow. He also applied gel to her chest for the echocardiogram. But as he was applying, he "kept going down farther" with the gel past her chest and onto her stomach. Harris then unzipped the patient's jeans, told her they needed to come off, and pulled off her pants. Harris continued rubbing the gel "on [her] belly and down in [her] groin." He asked the patient if his rubbing hurt, and she said no.

"Then all at once he stuck his finger up in" the patient's vagina. Harris then said he needed to do something on the machine and walked away from the table. The patient started to get off the exam table, and Harris grabbed her jeans and helped her put them back on. He slipped his business card in her back pocket. The patient then put her bra and shirt back on—Harris did not leave the room while she changed. The patient then left the room, exiting so quickly she still had the echocardiogram patches on her body from the exam.

The patient went back to the waiting room, as she had another appointment with her treating physician right after the exam. During that appointment, she reported what happened and the physician observed "an exorbitant amount of gel"

on the patient's "lower abdomen, pelvic area, [and] groin." The physician called law enforcement to report the abuse.

*The Second Patient.* After experiencing a heart attack and suffering ongoing palpitations, a seventy-five-year-old woman was referred for an echocardiogram. Harris brought the patient back to the exam room and instructed her to remove all clothing except her underwear. Though she was disrobed beyond what was necessary for the test, the appointment otherwise continued as normal. But toward the end of the exam, Harris began working toward her groin. The patient mentioned a health issue she was experiencing in her vaginal area. Harris then put his fingers into her underwear and touched her genitals. The patient never asked Harris to examine or touch her genitals.

The patient told no one. Months later, law enforcement was investigating the first patient's abuse and an officer contacted her as another former patient. The patient then disclosed to the officer that Harris touched her inside her underwear during the exam.

*The Trial.* The State charged Harris with two counts of third-degree sexual abuse. *See* Iowa Code §§ 709.1, 709.4(1)(a) (2023). During the four-day jury trial, both patients testified about the abuse, among other witnesses. Harris also testified in his defense.

Harris explained that he was qualified to screen patients for certain medical conditions, including deep vein thrombosis ("DVT"). Part of that screening entails pushing or compressing areas near the patient's pelvis, upper thigh, and knee. He asserted that the facility knew he was performing these DVT screenings, even though they were outside of his assigned duties. For both patients, Harris denied

any contact with their vaginal areas.  Instead, he testified that he observed symptoms of DVT in both women, they gave consent for him to perform a screen, and any touching or removing of clothing was limited to those screens.  And he explained he did not document the screens in either patient's medical records because both screens were negative.

The jury convicted Harris on both counts of third-degree sexual abuse.  He was sentenced to two consecutive ten-year terms of incarceration.  Harris now appeals both convictions.

II.

Harris disputes that sufficient evidence supported convicting him of third-degree sexual abuse for either patient.  We review his challenge for correction of errors at law.  *See State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011).  "In doing so, we examine whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record."  *Id.*  "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).  "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding."  *Id.* (cleaned up).

To convict Harris of third-degree sexual abuse, the jury must have found— as it was instructed—that he "performed a sex act" with each patient "by force or against the will" of each patient.  And a "sex act" was defined to include "any sexual contact . . . [b]etween the finger or hand of one person and the genitals or anus of

another person." *See* Iowa Code §§ 709.1, 709.4(1)(a); *see also State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (explaining unopposed jury instructions become the law of the case when reviewing whether sufficient evidence supports a conviction).

Harris disputes whether the State proved he performed a "sex act" on either patient, arguing the State's evidence only showed incidental and nonsexual contact. "The sexual nature of the contact can be determined from the type of contact and the circumstances surrounding it." *State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994) (en banc). A jury may consider, for example, "whether the contact was made to arouse or satisfy the sexual desires of" Harris, though "the lack of such motivation would not preclude a finding of sexual abuse where the context in which the contact occurred showed the sexual nature of the contact." *Id.* Other considerations could include Harris's relationship with the patients; "whether anyone else was present; the length of the contact; the purposefulness of the contact; whether there was a legitimate, nonsexual purpose for the contact; where and when the contact took place; and the conduct of [Harris] and [the patients] before and after the contact." *Id.*

Viewing the circumstances of both patient encounters in the light most favorable to the State, substantial evidence supports the jury's finding that Harris performed sex acts on the patients. Both patients testified about their abuse—that Harris inserted his finger into the first patient's vagina and touched the second patient's vaginal area inside her underwear. *See State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021) ("A sexual abuse victim's testimony alone may be sufficient evidence for conviction."). Harris conceded during trial there would be no medical

purpose for that kind of contact during a DVT screen. *Cf. In re J.D.S.*, 436 N.W.2d 342, 349 (Iowa 1989) (reasoning that the defendant's conduct—including inserting a finger in the minor victim's anus—"belies his implication that he was just checking to see if [the victim] had spoiled his pants" and that "the circumstances reveal the sexual purpose for which [the defendant's] finger was used"), *overruled on other grounds by State v. White*, 9 N.W.3d 1, 12–13 (Iowa 2024). So the jury, crediting the patients' testimonies, could find Harris performed sex acts on both patients.

What's more, Harris far exceeded the scope of his duties by touching the patients' legs, groin, and vaginal areas. An echocardiogram is an ultrasound of the heart—Harris had no legitimate reason to touch any other area of the patients' bodies. Harris also undressed both of them beyond what was necessary to perform an echocardiogram. The jury was free to reject Harris's DVT-screen explanation as not credible, particularly given his concessions that those screens were outside his job duties and he never documented the screens in the patients' medical records. *See Pearson*, 514 N.W.2d at 455 ("The fact that no nonsexual purpose for the contact was discernible also demonstrated the sexual nature of the contact."). And Harris's conversations with the patients further supports finding that his conduct was unrelated to any medical purpose.[1]

Substantial evidence thus supports the jury's finding that Harris performed a sex act against the will of each patient. And so, we affirm his convictions.

**AFFIRMED.**

---

[1] During trial, the State called another of Harris's patients as a witness, who testified Harris also gave her his card and told her she "can call [him] but don't tell anyone." This evidence corroborates the patients' accounts and shows that Harris often flouted professional boundaries.