# IN THE COURT OF APPEALS OF IOWA

No. 21-1445
Filed March 8, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CARLOS ALLEN HIVENTO,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Johnson County, Kevin McKeever,

Judge.


        Carlos Hivento appeals his convictions for third-degree sexual abuse.

**AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Nan Jennisch, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


        Considered by Vaitheswaran, P.J., Tabor, J., and Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**MULLINS, Senior Judge.**

> The overall purpose of Iowa's sexual abuse statute is to protect the freedom of choice to engage in sex acts. The sex abuse statute exists to protect a person's freedom of choice and to punish unwanted and coerced intimacy. A person who imposes a sex act on another by force or compulsion under any circumstance violates the other's protected interest. Yet, nonconsent includes both consent that is nonexistent and consent that is ineffectual, and these circumstances have been largely assimilated into the statute to account for its present expanded categories of rape. Nevertheless, *the unifying principle among this diversity of conduct is the idea of meaningful consent.*

*State v. Meyers*, 799 N.W.2d 132, 143 (Iowa 2011) (emphasis added) (cleaned up).

In this case, we are tasked with assessing the presence or absence of meaningful consent. A nineteen-year-old freshman at the University of Iowa planned on a night out with friends in downtown Iowa City. The friends drank heavily—as college kids do—and the young co-ed, A.H., became heavily intoxicated. She testified at Carlos Hivento's criminal trial that she had never met him before and did not remember meeting him that night. All she could remember was "the staircase," where she hit her head and back against the stairs. The next thing she knew, she woke up naked in a hotel room bed with Hivento, also naked, kneeling over her and filming her with his phone. Turns out, the two shared various sex acts in the stairwell and the hotel room throughout the night in question, and Hivento took several videos of those acts on his phone for his later viewing pleasure. A.H. did not remember any of it. Despite A.H.'s demeanor in the videos aligning with one witness's characterization of her as lethargic and "just like . . . a zombie," Hivento later told police that "she wanted it."

The jury found Hivento guilty on five counts of third-degree sexual abuse.[1] Hivento appeals, challenging the sufficiency of the evidence supporting those convictions. Specifically, he argues the evidence was insufficient to support either of the dual alternative theories that the sex acts were done either: (1) "by force or against the will of the other person" or (2) "while the other person [was] mentally incapacitated, physically incapacitated, or physically helpless." *See* Iowa Code § 709.4(1)(a), (b)(1), (d) (2018). In relation to his challenge, he also contests the constitutionality of Iowa Code section 814.28 (Supp. 2019) on general verdicts.

Finding each alternative has substantial evidentiary support, we affirm the convictions. Because section 814.28 is not implicated, we leave the question of its constitutionality for another day.

## I.    Background

### A.    The Night Out

On the evening of November 17, 2018, several college-aged individuals attended a "pregame" party at A.M.'s[2] Iowa City apartment. The purpose of a pregame was described as "[g]etting drunk at home, that way you don't have to pay for as many drinks at the bars." It was a reunion of sorts proximate to Thanksgiving break from classes among friends and acquaintances who grew up in the Iowa City area. The group consisted of seven people: A.M., J.B., L.S., M.M., A.H., and two others. Everyone consumed alcohol at the apartment before they went to downtown Iowa City to consume more alcohol. A.H. arrived at A.M.'s

---

[1] The jury also found Hivento guilty on two counts of invasion of privacy. Those convictions are not challenged in this appeal.

[2] We find it unnecessary to provide the names of A.H.'s friends and acquaintances for purposes of this opinion.

shortly after 8:30 p.m. A.M. testified A.H. was the last to arrive and, when she did, she already had a "Tall Boy drink" in hand. L.S. recalled A.H. "immediately started drinking with the rest of us" when she arrived. A.M. could not recall how much A.H. drank at the apartment, but she recalled that everyone was doing shots, and "[w]e wouldn't leave someone out." M.M. specifically recalled everyone was taking shots of "hard liquor" at the apartment.

After arriving downtown at roughly 10:00 p.m.,[3] the group went to various bars, at each of which members of the group were "buying rounds" for each other. The evidence suggests A.H. was separated from the group between roughly 11:00 p.m. and 12:00 a.m. However, she reconvened with the group at the last bar the group went to, the Union. At some point after midnight on November 18, everyone in the group except A.H. left the Union.[4] A.H. remained at the Union with some friends of hers from high school.

No one in the group recalled anyone using drugs, but all who testified pretty much agreed everyone was intoxicated, which aligned with everyone's goal that night—"to go out with friends and get drunk." As to A.H.'s condition when A.M. left the Union, A.M. testified: "I knew she was drunk, I thought she was drunk, but it seemed like she was safe with her friends." J.B. testified everyone was consuming alcohol at the apartment and downtown, but nothing stuck out in his mind concerning A.H. being unable to have a conversation or walk on her own. M.M.

---

[3] M.M.'s Lyft receipt, which was admitted as evidence, shows the group was picked up at A.M.'s apartment at 9:57 p.m., and they were dropped off downtown at 10:03 p.m.

[4] M.M.'s Lyft receipt after leaving the bar shows she was picked up from downtown at 12:43 a.m. on November 18. M.M. testified she left the bar with everyone in the group but A.H., but not all of them shared the Lyft from downtown.

opined A.H. was intoxicated and "[n]ot completely aware of her surroundings." D.C., who has been friends with A.H. since elementary school, testified he saw A.H. outside the Union sometime between 11:00 p.m. and 1:00 a.m. the following morning. He recalled she was intoxicated to an extent that he decided to check on her later.

### B. Encounter with Hivento

Footage captured by the surveillance system of another downtown bar, DC's, depicts that, at 1:07 a.m., A.H. was outside of the bar with friends, apparently including D.C. At 1:09 a.m. A.H.'s group entered the bar, while she remained outside by herself, as she had lost her fake ID by that point. The video shows A.H. had trouble maintaining her balance by this point in the evening. Roughly forty seconds later, Hivento passed by A.H. standing outside the bar alone and then entered the bar. He returned to the entry of the bar about fifteen seconds later, apparently said something to A.H., and she briefly followed him inside. About twenty seconds later, both returned outside and started a conversation. After conversing momentarily, at 1:11 a.m., they proceeded north together outside of this camera's view. Another camera then shows them taking a hard right into a stairwell leading to apartments above another bar just seconds later.

The nine recordings Hivento took on his phone in the stairwell and hotel room were admitted as evidence at trial. The first five videos—recording more than eleven minutes of events—were taken in the stairwell between the time they entered the stairwell and roughly 1:30 a.m. They show a series of genital-to-genital and genital-to-oral sex acts, always showing Hivento in a dominating, controlling position. A.H.'s eyes appear to have been closed almost the entire time. Some of

the videos show her head and face buried in the stairs with Hivento behind her. Others show him clearly directing or moving her head with his hand. In the middle of at least one of the videos, Hivento turned the camera to his face and stuck his tongue out.

There are times A.H. can be heard groaning and sniffling. On another occasion while Hivento is performing sex acts, A.H. remains with her head down until Hivento grabs her hair and pulls her head back to him and begins kissing the side of her face and ear. A.H.'s eyes never appear to be open during this video either.

In another video, while Hivento was committing a sex act, he directed A.H. several times: "Let me see those pretty eyes." A.H. opens her eyes momentarily and then closes them again. The state of A.H.'s eyes can be described as unfocused and glazed over. The video concludes with Hivento ejaculating on A.H.

Footage captured by a nearby bank's surveillance system showed A.H. and Hivento walking through an alley at 2:23 a.m. and then entering into the back of the building that houses the Blue Moose Tap. At around bar closing time, cab driver Thomas Bane was dispatched to the Blue Moose Tap in response to a call for service. The evidence discloses the call for service was made at 2:31 a.m., and Bane picked up the passengers at 2:42 a.m. Bane picked up a male and a female, and the male directed him to transport them to the Iowa House Hotel. Bane recalled the female did not speak during the roughly five-minute transport, she was lethargic, and "[s]he couldn't even keep her head up." He later added: "[S]he was not right. She was aloof." Although he could not tell if she was intoxicated, he opined: "She was just like . . . a zombie. I mean, you know, it could be pills, it could

have been anything." Bane recalled when he got near the hotel that the male directed him to drop them off in the back of the hotel, which Bane thought "was odd." The male paid for his fare in cash.

John Hogan was working the overnight shift at the Iowa House Hotel on November 17 and into November 18. He testified that between 3:00 and 3:30 a.m. on November 18, a young gentleman came to the front desk and requested a room. Hogan recalled that, from the direction the man came, he did not use the main entrance to the hotel. He was by himself and did not have any luggage or bags. According to the guest registration form, the man told Hogan his name was "Carlos Evanto." The man paid for his room in cash, and Hogan placed him in room 230. The booking receipt shows the room booking was made at 3:03 a.m.

The four remaining recordings were taken by Hivento in the hotel room between 4:02 a.m. and 4:12 a.m. The first is nearly five minutes long. The recordings show genital-to-genital and genital-to-oral sex acts. One of the videos shows A.H. lying on her side with her eyes closed, arguably either passed out or asleep. Another video appears to show A.H. slumped over onto the bed face first, upon which Hivento turns the camera toward him and sticks his tongue out.

### C.     Intervening Events

A.H. did have contact with others during her encounter with Hivento. L.S. exchanged text messages with A.H. throughout the morning of November 18. At roughly 2:00 a.m., A.H. reported "I'm good" and advised she was going to "Burge," the dormitory where L.S. knew she lived. About an hour later, at 2:57 a.m., L.S. questioned: "R u ok." A.H. responded in the affirmative fifty minutes later, at 3:47 a.m. Then, at 4:44 a.m., A.H. questioned L.S. where she was and advised she

needed to get her keys from A.M.'s apartment. L.S. was asleep at the time and did not respond until 7:10 a.m. At 1:46 a.m., D.C. texted A.H. and questioned, "Yo are you good[?]" After A.H. responded, "Yeah," D.C. questioned: "Did you make it back alright because you were 10/10 fucked lmao."[5] After responding "I'm good" and sending nonsensical texts to D.C., A.H. reported she was going to Burge, her dorm. A.H. testified she could not remember making any of these communications and she really couldn't even understand most of them.

### D. A.H.'s Testimony

A.H. testified she took shots at the pregame at A.M.'s apartment, although she couldn't recall how many she took. She "was definitely feeling the effects of the alcohol by the time [she] got downtown." She recalled that she continued drinking when she was out at the bars but couldn't remember how much. She did not remember a whole lot from that night, and she did not recall seeing D.C. downtown. She remembered "the staircase" that night, but only that she "was hitting [her] head and back against the stairs" and recalled what "looked like a flashlight" being near her face. The next thing she remembered after being downtown was waking up in a bed in a hotel room, but she had no idea where she was. She recalled slowly waking up and "was really confused," while Hivento was "kneeling over [her] without his clothes on, and [she] didn't have [her] clothes on and the same flashlight was out over" her. A.H. did not know who Hivento was.

---

[5] "Lmao is the abbreviation for laughing my ass off. Typically people use it in written conversations to show that they think something is funny." *What does Lmao Mean?*, Grammarlyblog, https://www.grammarly.com/blog/lmao-meaning/ (last visited Feb. 6, 2023).

At that point, she realized the light was coming from Hivento's phone. A.H. grabbed the phone because she thought Hivento was recording her and, when she looked at the phone, she saw screenshots of videos on the phone's camera roll of herself without her clothes on. After Hivento grabbed his phone back, A.H. told him to delete the videos, but he declined, explaining "he wanted to watch them later or something." A.H. located her clothes and phone, went into the bathroom, and locked the door. She tried to text a friend who had recently tried to contact her, M.D.[6] When he did not respond, she tried to leave, but Hivento didn't want her to. She eventually made it out of the room and separately called M.D., L.S., and A.M., but none of them answered. After she reached the lobby of the Iowa Memorial Union (IMU), which is attached to the hotel, she realized where she was and called dispatch for Iowa City Police at 5:10 a.m. An audio recording of the call to dispatch discloses the following exchange:

> DISPATCH: Thanks for holding how can I help you?
> A.H.: Hi, uhm, so this is not an emergency, but I would like to request an officer presence.
> DISPATCH: What's the location?
> A.H.: It's the IMU in downtown Iowa City.
> DISPATCH: Okay. What would be the reason for the officer?
> A.H: Uhm—I—just left a person—it's the Iowa House Hotel and I just left a person's room, and uhm—I, I—really want to talk to an officer about it but uhm—.
> DISPATCH: Well, hold on here and I'll go ahead and transfer you over to campus police, they would handle the IMU.
> A.H.: Okay. Thank you.

A.H. explained she did not call 911 or report it was an emergency because she was not sure where Hivento was in the building and, in the event he saw an

---

[6] The call log on A.H.'s phone shows she most recently missed two calls from M.D. at 3:09 a.m. The evidence shows A.H. had previously sent M.D. snap chats indicating she did not know where she was.

emergency response to the hotel, he could possibly do something to her. Two officers arrived, and one of them transported A.H. to the emergency room. By the time she got to the hospital, her entire body hurt. After she removed her clothes to be examined, A.H. discovered she had marks on her arms, legs, and neck that were not there before.

### E. Aftermath

Officer Jaclyn Anderson of the University of Iowa Police Department was one of the officers who responded to the hotel. She encountered A.H. upon entering the IMU. A.H., who was shaking and crying, reported "she had woken up nude and didn't know how she got into the room or how she got—how the clothes came off." Anderson observed a bite mark on A.H.'s neck. As Anderson was speaking with A.H., at 5:16 a.m., A.H.'s phone received a text message from "Karlos," which read as follows: "Plz call me plz we can work this out, I promise you. I knw we dnt knw each other super well, but U actualy mean a lot 2 me (prbly mor than ne1 besides myself) & if u let me; I will make this up2u ok?" A.H. did not know how the contact for Karlos got into her phone, nor did she remember sending Karlos a single text at 2:31 a.m. stating "[A.] from dcs." Anderson then transported A.H. to the hospital.

Sexual assault nurse examiner Katy Rasmussen examined A.H. at the hospital. She observed and photographed bite marks to A.H.'s neck and right elbow, bruising and scratching to her left arm, and bruising and redness to her legs. A vaginal exam also revealed redness and tearing in that area.

Detective Greg Hall of the University of Iowa Police Department obtained a search warrant for hotel room 230. When officers executed the warrant, they found

Hivento in the hotel room, sleeping on the ground between the room's two beds. Officers awoke him and seized his nearby iPhone. When the phone was unlocked, the recent google search "how to delete all photos from iphone" displayed on the screen. When Hivento stood up, he advised he was going to be sick, went to the bathroom, and knelt in front of the toilet. While Detective Hall did not hear Hivento vomit, he observed "something" that was "small and white" go from Hivento's mouth into the toilet, and Hivento flushed the toilet before it could be recovered. Officers searched Hivento's person and found loose white powder in his pockets and several blister packs of caffeine pills. They also found another phone. Later, officers discovered the videos of A.H. on the iPhone that were "sexual in nature." The time stamps on the videos ranged from shortly after 1:00 a.m. to almost 4:00 a.m.

During an interview at the police station, Hivento reported to Detective Hall that he was in Iowa City from Cedar Rapids to meet a friend and go to the bars, but when Hivento was at the Blue Moose Tap with his friend, they parted ways. A video of the interview that was admitted as evidence discloses the following. Hivento explained he met A.H. at DC's and did not know her beforehand. He said he approached her as she was leaving and suggested getting some drinks somewhere. According to Hivento, "Obviously she was really into me and we just started making out." They left after about five minutes later to go get some drinks. Because she was so into him, according to Hivento, they went in an apartment hallway and made out instead of going somewhere else to get drinks. He elaborated they went to his old apartment right next to the Fieldhouse bar and made out in the hallway. He agreed they had sex "right there" in the hallway, then

they decided to get a hotel room. He explained she was "responding positively and stuff" to him in the hallway and she "seemed fine with it" and was "really horny" so he just "kept going" and she ultimately stated "let's just do it right here." Hivento directed Hall to his videos, stating, "she never says stop I don't think," and "she was definitely really into me you can definitely tell." He stated the encounter lasted about thirty minutes and agreed he did not wear a condom and he ejaculated there. He asserted she was okay with him recording it, stating, "I don't care," but later on she got mad.

From there, according to Hivento, they got a cab to the hotel to have more sex. He explained they had sex then got the cab around 1:00 a.m. and later checked into the hotel at 1:30 a.m. When they got to the hotel room, A.H. advised she was "really horny" and just took off her clothes, after which they had more sex. As far as intoxication, Hivento opined A.H. was "not too bad." He explained the video would show "she was awake and stuff." Eventually they "got tired" and "just passed out." He agreed she later "left mad," and he thought it was because he didn't use a condom. He also agreed she had later "regrets" about letting him record it and got mad about him not deleting the videos. When Detective Hall confronted him with his assessment of one of the videos showing Hivento having sex with A.H. while she was passed out, Hivento disagreed, stating, "I mean, no she was awake." All in all, according to Hivento, "she wanted it." He later explained that, in the hallway, she specifically asked him to "face fuck" her. Detective Hall also confronted Hivento with the fact that he gave A.H. the number to his "burner" phone instead of his new iPhone, but Hivento could only provide illogical reasons for doing so. And Hivento agreed A.H. had various markings on

her body but submitted those were situationally caused by the sex in the narrow stairwell. As part of his investigation, Detective Hall also interviewed, A.H., but "[she] was not able to remember many details."

The sexual assault kit administered at the hospital was submitted to the state crime lab for analysis. Hivento's DNA was found on A.H.'s underwear, and her elbow, oral, anal, and perineal swabs.[7] A.H.'s urine tested positive for alcohol, cocaine metabolites, fluoxetine, and dextromethorphan. The toxicologist testified fluoxetine is an antidepressant that "slows the reuptake of serotonin so it makes the person feel better." She explained dextromethorphan is a cough suppressant that causes "drowsiness and dissociative feelings." A.H. testified she did not consume cocaine or a cough suppressant during the night in question.

### F.    Proceedings

Hivento was charged by trial information, as amended, with five counts of third-degree sexual abuse and two counts of invasion of privacy. The respective counts of sexual abuse concerned the following alleged sex acts: (1) genital-to-mouth contact in the stairwell, (2) penile penetration into the vagina or anus in the stairwell, (3) ejaculation onto the other person in the stairwell, (4) penile penetration into the vagina or anus in the hotel room, and (5) genital-to-mouth contact in the hotel room.[8] *See* Iowa Code § 702.17(1), (2), (4) (defining "sex act"). Each count alleged the sex act was done by force or against the will of the victim; while the victim was suffering from a mental defect or incapacity that precluded

---

[7] The probability of the same profile in a population of unrelated individuals would be "1 out of 180 octillion."

[8] The marshalling instructions provided to the jury for the respective counts generally mirrored the allegations contained in the charging document.

giving consent; "and/or" while the victim was mentally incapacitated, physically incapacitated, or physically helpless. *See id.* § 709.4(1)(a), (b)(1), (d). But only two alternatives were placed before the jury, that the sex act was done either (1) "[b]y force or against the will of" A.H. or (2) "[w]hile [A.H.] was mentally incapacitated, physically incapacitated or physically helpless." On general verdict forms, a jury found Hivento guilty as charged. Hivento now appeals.

## II.      Standard of Review

We review a challenge to the sufficiency of evidence for errors at law, giving deference to the verdict, which binds us if it is supported by substantial evidence. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). We review challenges to statutes as unconstitutional de novo. *See Kluender v. Plum Grove Invs., Inc.*, ___ N.W.2d ___, ___, 2023 WL 1484247, at *3 (Iowa 2023).

## III.      Discussion

### A.      Introduction

We begin with a brief primer given the claims raised in this appeal. Specifically, we note that the jury was provided with two alternative theories for third-degree sexual abuse, and the jury returned their verdicts on a general verdict form. "Under prior law, if the evidence was insufficient under one alternative, we would not try to divine which alternative the jury embraced and instead would reverse for retrial." *State v. Pendleton*, No. 21-1208, 2023 WL 152526, at *6 (Iowa Ct. App. Jan. 11, 2023) (citing *State v. Tyler*, 873 N.W.2d 741, 457 (Iowa 2016)); *accord State v. West Vangen*, 975 N.W.2d 344, 348 (Iowa 2022) ("Previously, if a jury returned a general verdict in a case involving multiple theories to establish the same offense but not all theories were supported by sufficient evidence, the

defendant would generally be entitled to a new trial without the unsupported theories."). Effective July 1, 2019, our legislature overruled that practice by enacting Iowa Code section 814.28 (Supp. 2019), which provides:

> When the prosecution relies on multiple or alternative theories to prove the commission of a public offense, a jury may return a general verdict. If the jury returns a general verdict, an appellate court shall not set aside or reverse such a verdict on the basis of a[n] . . . insufficient theory if one or more of the theories presented and described in the complaint, information, indictment, or jury instruction is sufficient to sustain the verdict on at least one count.

*Accord West Vangen*, 975 N.W.2d at 348 (noting prior practice is "no longer the case" given section 814.28); *see also State v. Brimmer*, 983 N.W.2d 244, 259 (Iowa 2022) (noting *Tyler* was superseded by section 814.28); *State v. Stendrup*, 983 N.W.2d 231, 243 (Iowa 2022) (same).[9]

In this appeal, Hivento argues the evidence was insufficient to support either of the alternative theories. And to the extent only one of them is supported, he argues section 814.28 is unconstitutional in various respects and therefore does not save the general verdicts. But if each theory is supported by substantial evidence, the statute is not implicated and we need not address the constitutional challenge. *See West Vangen*, 975 N.W.2d at 348; *Pendleton*, 2023 WL 152526, at *6. We proceed accordingly.

### B. Sufficiency of Evidence

In reviewing a challenge to the sufficiency of the evidence, the court views "the evidence 'in the light most favorable to the State, including all reasonable

---

[9] We also note the prior practice only applied to jury verdicts, as opposed to verdicts following a bench trial. *See State v. Warren*, 955 N.W.2d 848, 857–58 (Iowa 2021).

inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

Here, the unchallenged instructions to the jury serve as the law of the case for purposes of reviewing the sufficiency of the evidence. *See State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018). Hivento does not appear to dispute he engaged in the sex acts alleged. He only disputes the sufficiency of the evidence supporting the alternative circumstances that the acts were done either by force or against the will of A.H. or while she was mentally incapacitated, physically incapacitated, or physically helpless. Specifically, the jury was instructed the State was required to prove that each subject sex act was done either (1) "[b]y force or against the will of" A.H. or (2) "[w]hile [A.H.] was mentally incapacitated, physically incapacitated or physically helpless."

### 1. By force or against will

As to the first alternative—that the sex act was done by force or against A.H.'s will—the jury was further instructed as follows:

> [T]he State must prove that the Defendant committed a sex act "by force or against the will" of [A.H]. In order to do so, however, the State does not have to prove that [A.H.] physically resisted the defendant's acts. It does not require evidence of both force and lack of consent, but one or the other.
>
> The force used by the Defendant does not have to be physical. It may consist of threats of violence against [A.H.] or another person which overcame [A.H.]'s will by fear.
>
> You may consider all the circumstances surrounding the Defendant's acts in deciding whether the act was done by force or against the will of [A.H].

*See* Iowa Code § 709.5.

The by-force-or-against-will alternative of sexual abuse dates back to the common law. *See Meyers*, 799 N.W.2d at 141. A variation was memorialized in Iowa's initial territorial statutes in 1839. *See* Statute Laws of the Territory of Iowa, Courts § 21 (1839) (criminalizing "carnal knowledge of any woman forcibly and against her will"); *see also* Revised Statutes of the Territory of Iowa ch. 49, § 24 (1843) ("Rape is the carnal knowledge of a female, forcibly and against her will."). The variation made its way into the Iowa Code after our state joined the union. *See* Iowa Code § 2581 (1851). As the jury was instructed, Iowa law now criminalizes a sex act that is done "by force *or* against the will of the other person." *Meyers*, 799 N.W.2d at 141 (quoting Iowa Code § 709.4(1)).

While the penal statute offers various circumstances that would amount to third-degree sexual abuse, "consent remains the lynchpin of the crime." *Id.* at 142. The alternative in play here has been left "in place to capture all circumstances of actual nonconsent," and it "seeks to broadly protect persons from nonconsensual sex acts." *Id.* at 142–43. "[N]onconsent includes both consent that is nonexistent and consent that is ineffectual." *Id.* at 143. The overarching question is based on "the idea of meaningful consent." *Id.* (citation omitted).

Hivento argues the evidence shows that all of the sex acts were consensual, thus negating the establishment of this alternative. He states the videos do not show him "physically restraining her, pushing her, or otherwise being rough with her," and "[h]e made no threats of harm, nor did he raise his voice." He also states the video shows "A.H. was able to communicate and was responsive to his sexual requests," and "[s]he appeared to be a willing and voluntary participant in the sexual activity."

Even if we were to accept Hivento's questionable-at-best claim that force is absent, lack of consent by itself is sufficient, and Hivento's claim of consent is a far cry from what the evidence shows. For starters, we agree with Hivento that "abundant evidence was presented regarding A.H.'s intoxication." She had been consuming alcohol—mainly hard liquor—for hours by the time of her encounter with Hivento. A close friend who knew A.H. for many years characterized her level of intoxication as "10/10." While Hivento is correct that A.H. could communicate with others through text message and social media, he ignores the fact that those messages were plagued with gibberish, which the evidence shows is the result of her heavy intoxication. Turning to the videos, they tell a vastly different story than what Hivento suggests, especially when considering the level of A.H.'s intoxication. Her demeanor in the videos aligns with the cab driver's characterization of her as lethargic and "just like . . . a zombie." She is largely unresponsive in the videos. On the one occasion she opened her eyes, they are visibly unfocused and glazed over. The videos hardly depict A.H. to be a participant in the acts at all, let alone a "willing and voluntary" one, as Hivento suggests.

"When determining whether a person has performed a sex act by force or against the will of another person, 'the circumstances surrounding the commission of the act may be considered in determining whether or not the act was done by force or against the will of the other.'" *State v. Herndon*, No. 99-1103, 2000 WL 1298740, at *1 (Iowa Ct. App. Aug. 30, 2000) (quoting Iowa Code § 709.5). This means all circumstances, subjective and objective alike. *See State v. Bauer*, 324 N.W.2d 320, 322 (Iowa 1982).

Although she was intoxicated and could not remember, A.H. essentially testified these sex acts were against her will. *See State v. Silva*, No. 17-0802, 2018 WL 1858294, at *5 (Iowa Ct. App. Apr. 18, 2018) (finding substantial evidence where "complaining witness testified unequivocally that the sex acts were against her will"); *State v. Feuring*, No. 15-1438, 2016 WL 4801654, at *5 (Iowa Ct. App. Sept. 14, 2016) (relying on testimony from victim that she never consented to sex acts to find substantial evidence that sex act was by force or against her will); *Herndon*, 2000 WL 1298740, at *1 (same). Indeed, A.H. was heavily intoxicated, as shown in the videos, and the fact that she could not recall meeting Hivento or engaging in sex acts with him is substantial evidence of nonconsent. *See State v. Hameed*, No. 12-1630, 2013 WL 3458095, at *4 (Iowa Ct. App. July 10, 2013) (finding victim's intoxication, resulting mannerisms, and inability to remember sex act provided substantial evidence that sex act was against her will). All A.H. recalled was waking up naked in a bed with Hivento while he was also naked and filming her with his penis in the area of her vagina. *See State v. Lopez*, No. 10-0766, 2012 WL 163232, at *4 (Iowa Ct. App Jan. 19, 2012) ("The victim's testimony that she was sleeping or passed out and when she awoke or regained

consciousness [and] Lopez was on top of her performing intercourse was sufficient evidence the sex act was against her will."); *State v. Farnum*, 554 N.W.2d 716, 717–18 (Iowa Ct. App. 1996) (finding substantial evidence sex act was against will where victim "became very intoxicated" and "[t]he next thing she remembered was being awakened in [an] apartment with defendant on top of her. Her shorts and underwear had been removed and defendant's penis was in her vagina."). A vaginal exam also showed injury to that area, and A.H. exhibited bruising about her body that was not there before her encounter with Hivento, thus suggesting use of force.[10] *See Feuring*, 2016 WL 4801654, at *5 (noting vaginal injury was consistent with forced penetration).

All in all, the jury could rationally conclude A.H.'s intoxication negated any ability on her part to provide meaningful consent, which is all that is required by the sex abuse statute. *See Meyers*, 799 N.W.2d at 143; *see also State v. Mousa*, No. 19-1748, 2022 WL 610315, at *5 (Iowa Ct. App. Mar. 2, 2022) (finding "the jury could determine [an intoxicated victim] could not give meaningful consent to a sex act with Mousa—a stranger" she had just met—so "[t]here [was] substantial evidence to support the jury's finding that the sex act was committed against [her] will"). As a result, we find substantial evidence supported this alternative theory of the crimes under each count.

---

[10] We are mindful that Hivento's videos did not capture all of his encounter with A.H. Based on A.H.'s injuries, the jury could have rationally concluded acts of physical force were used.

### 2. Incapacitation or helplessness

Turning to the second alternative—that the sex acts occurred while A.H. "was mentally incapacitated, physically incapacitated or physically helpless"—the jury was instructed on incapacitation and helplessness as follows:

> 1. "Mentally [i]ncapacitated" means that a person is temporarily incapable of controlling the person's own conduct due to the influence of a narcotic, anesthetic, or intoxicating substance.
> 2. "Physically helpless" means that a person is unable to communicate an unwillingness to act because the person is unconscious, asleep, or otherwise physically limited.
> 3. "Physically incapacitated" means that a person has a bodily impairment . . . or handicap that substantially limits the person's ability to resist or flee.

On this theory, while Hivento agrees "A.H.'s alcohol consumption may have caused her to be disinhibited," he argues "it cannot be said that any impairment in her decision-making as a result of alcohol intoxication meets the legal standard of 'mentally incapacitated.'" He does not specifically explain why.

As the State points out, Hivento does not challenge the sufficiency of the evidence supporting conclusions that A.H. was either physically helpless or incapacitated. We could deem such challenges waived and affirm under one of these sub-alternatives. *See* Iowa R. App. P. 6.903(2)(g)(3). But, based on all of the foregoing, and viewing the evidence in the light most favorable to the State, we summarily conclude the evidence could easily convince a rational jury that A.H. was temporarily incapable of controlling her own conduct due to the influence of an intoxicating substance. *See Wickes*, 910 N.W.2d at 563. As a result, we find substantial evidence supported this alternative theory of the crimes as well.

**C.      Constitutional Claim**

Having found both theories that were submitted to the jury are supported by substantial evidence, we need not address Hivento's challenge to section 814.28 as unconstitutional.  *See West Vangen*, 975 N.W.2d at 348; *Pendleton*, 2023 WL 152526, at *6.

**IV.    Conclusion**

We affirm Hivento's convictions for third-degree sexual abuse.

**AFFIRMED.**